# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| WISCONSIN MANUFACTURERS AND COMMERCE INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>KAREN HYUN, )<br>*in her official capacity as* )<br>*Secretary-Designee of the Wisconsin* )<br>*Department of Natural Resources*, )<br><br>Defendant. ) | Case No. 3:25-cv-155 |

## Complaint

Plaintiff alleges its complaint against Defendant as follows:

### Introduction

1.    The Clean Air Act (CAA) governs pollution emitted from mobile sources and stationary sources. *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 308 (2014).

2.    Stationary sources comprise immovable structures like "factories and powerplants." *Id*.

3.    Mobile sources, true to their name, are different.

4.    Mobile sources comprise, to begin with, "on-road" vehicles like cars and trucks. *Id*.

5.    They also comprise another class called "nonroad sources."

1

6.      Aptly named, nonroad sources are built for use in yards, driveways, water bodies, and the like. *See Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 454 (D.C. Cir. 2013).

7.      Operable in so many places, this class is galactic: nonroad sources[1] comprise countless kinds of motorized implements, like lawnmowers, snowblowers, tractors, bulldozers, shredders, and boats (from outboard-powered pontoons to large, oceangoing cargo vessels). 40 C.F.R. § 1068.30(1)(i)–(iii)[2]; *Am. Rd. & Transp. Builders Ass'n*, 705 F.3d at 454.

8.      Every nonroad source, regardless of function, is a type of mobile source. *Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011).

9.      Faithful to the best interests of federalism, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 630 (2012) (Ginsburg, J., concurring in part), the CAA splits the power to regulate sources of air pollution. *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).

10.     Under the CAA, the federal government, through the Environmental Protection Agency (EPA), primarily regulates emissions from mobile sources—and the states, from most stationary sources. *Jensen Fam. Farms*, 644 F.3d at 938.

---

[1] When used in this complaint, the term "nonroad source" refers collectively to both "nonroad engines" and "nonroad vehicles."

[2] This federal regulation has multiple subsections (1), so when citing 40 C.F.R. § 1068.30(1), this complaint refers to subsection (1) only for the definition of "nonroad engine."

11.   This "cooperative federalism" is a deliberate and "defining feature" of the CAA. *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516 (3d Cir. 2013) (citing *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1046 (D.C. Cir. 2001)).

12.   And it has been "since the CAA's inception." *Jensen Fam. Farms*, 644 F.3d at 938; *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078 (D.C. Cir. 1996); *see also Ctr. for Biological Diversity v. EPA*, 82 F.4th 959, 962 (10th Cir. 2023).

13.   Reserving mobile-source regulation for the federal government is dually justified: not only can most mobile sources cross state lines quickly (whether on their own wheels or aboard others); a field of state and federal regulations would "create nightmares for … manufacturers." *Engine Mfrs. Ass'n*, 88 F.3d at 1079.

14.   Despite the CAA's sensible federalist framework, the Wisconsin Department of Natural Resources (DNR) is imposing standards on emissions from nonroad mobile sources—sources reserved for (and already covered by) federal regulation. *See, e.g.*, 40 C.F.R. §§ 63.9285, 63.9300; 40 C.F.R. § Pt. 63, Subpt. PPPPP, Tbl. 1 (limiting carbon-monoxide emissions from nonroad engines that are tested in test cells); *see also Engine Testing Regulations*, EPA, https://www.epa.gov/vehicle-and-fuel-emissions-testing/engine-testing-regulations (collecting relevant federal engine-testing standards and regulations) (last updated Aug. 2, 2024).

15.   To impose those standards on nonroad sources, DNR is using its power over stationary sources.

16.     How? According to DNR, emissions from nonroad engines[3] become emissions from stationary sources (and thus emissions open for state regulation) when those engines are turned on and tested by manufacturers.[4]

17.     Testing, however, does nothing to morph the classification of a source.

18.     Yet right now when testing nonroad engines—for quality control, for research and development, for whatever reason—Wisconsin manufacturers must comply not only with EPA nonroad-source emissions standards but also with DNR stationary-source emissions standards.

19.     This double regulation generates the sort of bi-regulatory field the CAA was drafted to prevent.

20.     Such extensive regulation burdens manufacturers.

21.     It also warps the partnership ordained in the CAA.

22.     Congress foresaw this sort of state malfeasance, so to guard EPA's dominion and protect manufacturers from two-way regulation, the CAA checks state power. *Jensen Fam. Farms*, 644 F.3d at 938.

23.     Title 42 U.S.C. § 7543(e)(2)(B) preempts state standards that limit nonroad-source emissions, unless those standards have been approved by EPA and put to use in California. *Engine Mfrs. Ass'n*, 88 F.3d at 1087.

---

[3] The word "engine," as used in this complaint, refers only to internal combustion engines.

[4] This complaint uses "manufacturer" to include companies who actually build engines. It uses the word as well to include companies who purchase already-built engines and install them in their products.

4

24.    DNR's regulatory conduct here—imposing standards on nonroad-source emissions—was never condoned by EPA, and its standards were never adopted in California.

25.    Plaintiff Wisconsin Manufacturers & Commerce Inc. (WMC) therefore requests this Court declare preempted under 42 U.S.C. § 7543(e)(2)(B) DNR's imposition of standards on nonroad engines. WMC further requests this Court permanently enjoin DNR from using its stationary-source permitting power to impose standards on nonroad-engine emissions generated from manufacturer-run testing.

## Parties

26.    Plaintiff WMC is Wisconsin's largest business trade association, representing roughly 3,800 employers of every size and from every sector of the state's economy.

27.    WMC maintains its office at 501 East Washington Avenue, Madison, Wisconsin 53703.

28.    WMC is a not-for-profit business organized as a membership association under Section 501(c)(6) of the Internal Revenue Code. WMC represents the interests of its members. Its primary mission is to make Wisconsin the most competitive state in the nation in which to do business. To advance this mission, WMC advocates laws and policies enabling businesses and economic investment to flourish. This effort includes ensuring that WMC members are not subject to unlawful or excessive regulation.

29.    Karen Hyun is the Secretary-Designee of DNR. She is sued in her official capacity only.

## Jurisdiction and Venue

30.    This Court has jurisdiction over this complaint under 28 U.S.C. § 1331.

31.    Under 28 U.S.C. § 2201(a), this Court can provide a remedy to the dispute alleged. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–127 (2007).

32.    WMC seeks declaratory and injunctive relief from DNR's regulation of nonroad sources on the ground that 42 U.S.C. § 7543(e)(2)(B) preempts such regulatory conduct. Under the Supremacy Clause of the Constitution, 42 U.S.C. § 7543(e)(2)(B) prevails over DNR's policy. U.S. Const. art. VI, cl. 2.

33.    Questions of federal preemption present federal questions under 28 U.S.C. § 1331. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 643 (2002); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (citing *Ex parte Young*, 209 U.S. 123, 160–162 (1908)).

34.    No federal law strips federal courts of jurisdiction over questions involving the CAA.

35.    Venue is appropriate in this district. DNR has its headquarters at 101 South Webster Street, Madison, Wisconsin 53707. That is the address at which DNR Secretary-Designee Karen Hyun performs her official duties.[5]

---

[5] *See Missouri Elec. Cooperatives v. Missouri*, 229 F. Supp. 3d 888, 891 (E.D. Mo. 2017) (explaining although "there is no [federal law] for suits against state officials sued in their official capacity[,]" "[t]he general rule is that if a suit is brought against a state official in his official capacity, the official's residence is where he performs his official duties").

36.     WMC has standing to bring this lawsuit and assert the claims in this complaint on behalf of its members who have been affected by DNR's regulation of emissions from nonroad engines.

37.     WMC has members who manufacture nonroad engines and are subject to DNR's regulatory conduct challenged in this complaint. When testing nonroad engines, these members spend time and money ensuring they do not exceed DNR's emissions limits. If those limits persist, those members will continue spending time and money ensuring compliance with these preempted emissions standards.

38.     If this Court grants the relief WMC seeks, and DNR no longer engages in this illegal conduct, those members could spend that time and money improving their products and their manufacturing processes—not to mention upping employees' wages.

39.     Those members would therefore "have standing to sue in their own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

40.     WMC seeks to make Wisconsin the most competitive state in the nation in which to do business. DNR's illegal regulation of nonroad sources puts Wisconsin manufacturers at a disadvantage compared to manufacturers doing business in states where similarly illegal regulations on nonroad-source emissions are not imposed. As a result, the issue raised here—and the interests WMC seeks to protect

with this lawsuit—are germane to WMC's purpose of opposing unlawful regulation. *See Hunt*, 432 U.S. at 344.

41.    WMC brings a claim seeking declaratory and injunctive relief against the DNR policy challenged here. WMC therefore seeks no relief that "requires individualized proof" or cannot be "properly resolved in a group context." *Id*.

42.    Since beginning to perform the duties of DNR Secretary-Designee, Karen Hyun has continued the illegal regulatory conduct described in this complaint, and she will continue that conduct unless enjoined by this Court.

## Background

### *The Clean Air Act*

43.    Under the CAA, the federal government (through the EPA) must set National Ambient Air Quality Standards (NAAQS) for what are called "criteria air pollutants."[6] 42 U.S.C. § 7409(a)(1)–(2); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001).

44.    A NAAQS is simply "the maximum airborne concentration of [a] pollutant that the public health can tolerate." *West Virginia v. EPA*, 597 U.S. 697, 707 (2022) (citations omitted); *see New York v. EPA*, 716 F.2d 440, 441 (7th Cir. 1983); 42 U.S.C. § 7409(b).

45.    Once a NAAQS is set, each state must in turn develop a state implementation plan (SIP). *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 65

---

[6] Six pollutants make up this class: carbon monoxide (CO); lead (Pb); nitrogen dioxide ($NO_2$); ozone ($O_3$); particle pollution, or particulate matter (PM); and sulfur dioxide ($SO_2$). *NAAQS Table*, United States Environmental Protection Agency, https://www.epa.gov/criteria-air-pollutants/naaqs-table.

(1975); 42 U.S.C. § 7410. A SIP maps out how a state will conform with a NAAQS. *See West Virginia*, 597 U.S. at 707.

46.    To comply with a NAAQS, states must regulate emissions. *See* Kyle A. Piasecki, Comment, *Surviving Preemption in a World of Comprehensive Regulations*, 49 U. Mich. J.L. Reform Caveat 32, 34 (2015).

47.    Emissions typically originate from two types of sources: stationary sources and mobile sources. *Jensen*, 644 F.3d at 938.

48.    Stationary sources are generally immovable structures, like manufacturing facilities and power plants, that emit airborne pollution. *Util. Air Regul. Grp.*, 573 U.S. at 308.

49.    As defined in the CAA, a "stationary source" is "any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle." 42 U.S.C. § 7602(z).

50.    A stationary source, in other words, is anything that emits air pollution and is not a mobile source.

51.    Under the CAA, states can regulate emissions from existing stationary sources. *West Virginia*, 597 U.S. at 707. States therefore routinely impose standards on stationary-source emissions to keep in compliance with EPA's NAAQS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994) ("The states have broad license to institute their own programs

for the reduction of air pollution, principally through the regulation of stationary sources, such as industrial stacks and vents.").

52.     Mobile sources are different; the CAA generally[7] bars states from regulating mobile-source emissions to keep below a NAAQS. *Jensen Family Farms*, 644 F.3d at 938.

53.     The power to regulate mobile-source emissions is instead reserved largely for the federal government. *Id*.

54.     Under the CAA as it appeared in 1970, "mobile sources" meant primarily one thing: automobiles. *Engine Mfrs. Ass'n*, 88 F.3d at 1080.

55.     With the 1990 amendments to the CAA, however, the scope of the term "mobile sources" underwent great expansion (and thus so too did federal regulatory power). Johanna L. Wise Sullivan, *The Limited Power of States to Regulate Nonroad Mobile Sources Under the Clean Air Act*, 34 B.C. Envtl. Aff. L. Rev. 207, 213 (2007).

56.     The 1990 amendments recognized a new category of mobile sources called "nonroad sources." Curtis A. Moore, *The 1990 Clean Air Act Amendments: Silk Purse or Sow's Ear*, 2 Duke Environmental Law & Policy Forum 26, 35 (1992) (explaining nonroad sources represented the "last uncontrolled mobile source" before the 1990 amendments).

57.     "Nonroad sources" include all equipment powered by a "nonroad engine."

---

[7] As explained more below, California sometimes can regulate certain mobile sources, and other states can sometimes adopt those Californian regulations. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1087 (D.C. Cir. 1996).

58.    Under the CAA, the term "nonroad engine" is expansive, meaning any "internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition." 42 U.S.C. § 7550(10).

59.    "Motor vehicles"—categorically excluded from the definition of "nonroad engine"—are (under the CAA) "self-propelled vehicle[s] designed for transporting persons or property on a street or highway." 42 U.S.C. § 7550(2).

60.    So "nonroad source" includes anything powered by an internal combustion engine, unless that engine powers a vehicle used solely for competition or designed to transport people or property on roads.

61.    Quite a capacious concept, "nonroad sources" are, in EPA's words, "used in an extremely wide range of applications." Environmental Protection Agency, *Regulations for Emissions from Nonroad Vehicles and Engines*, EPA (January 11, 2024), https://www.epa.gov/regulations-emissions-vehicles-and-engines/regulations-emissions-nonroad-vehicles-and-engines.

62.    Indeed, as the definitions above imply, "nonroad sources" includes a galactic array of machines—bulldozers, skidders, tractors, lawnmowers, leaf blowers, weed whackers, chain saws, hay balers, log shredders. *See, e.g.*, Environmental Protection Agency, *Emission Standards Reference Guide: Overview of Mobile Sources*, EPA, https://www.epa.gov/emission-standards-reference-guide/basic-information-about-emission-standards-reference-guide-road#Overview; *Am. Rd. & Transp. Builders*, 705 F.3d at 454 ("The term 'nonroad engine' covers a wide variety of internal

combustion engines, including those found in tractors, construction equipment, lawnmowers, locomotives, and marine craft.").

63.     And EPA regulations implementing the CAA explain that an internal combustion engine is a "nonroad engine" if it "meets any of the following criteria":

(i)     It is (or will be) used in or on a piece of equipment that is self-propelled or serves a dual purpose by both propelling itself and performing another function (such as garden tractors, off-highway mobile cranes and bulldozers).

(ii)    It is (or will be) used in or on a piece of equipment that is intended to be propelled while performing its function (such as lawnmowers and string trimmers).

(iii)   By itself or in or on a piece of equipment, it is portable or transportable, meaning designed to be and capable of being carried or moved from one location to another. Indicia of transportability include, but are not limited to, wheels, skids, carrying handles, dolly, trailer, or platform.

40 C.F.R. § 1068.30(1)(i), (ii), (iii).

64.     Criteria (i) and (ii) use two tenses: the present (with "is") and the future (with "will be"). *See* Tenses, *Garner's Modern English Usage* (5th ed. 2022) (stating the present tense uses "is" and the future tense uses "will be").

65.     Both a present-looking and a forward-looking analysis therefore inhere in those criteria.

66.     Those criteria, that means, capture two categories: (1) engines that currently fit either of those descriptions and (2) engines that will someday fit either of those descriptions.

67.     If an engine is in either of those groups, it is a nonroad engine.

68.    Criterion (iii) identifies an immutable characteristic of a nonroad engine.

69.    So any engine that embodies that characteristic is a nonroad engine.

70.    Thus by reserving "mobile sources" for federal regulation, Congress has reserved for EPA regulation a gigantic class of air-polluting sources.

71.    And this is no empty reservation. Congress teethed it. Congress carved into the CAA provisions that preempt state efforts to regulate mobile sources. *See* 42 U.S.C. § 7543.

### *Preemption Under the Clean Air Act*

72.    Title 42 U.S.C. § 7543 contains two provisions that preempt state regulation of mobile sources. One provision (sub. (a)) preempts state regulations on automobile emissions. The other (sub. (e)) preempts state regulations on nonroad-source emissions.

73.    Subsection (e), which is relevant here, also has two subparts, each of which has two subparts of its own.

74.    Subdivision (e)(1) outright and explicitly bars every state from regulating two types of emissions: those from (A) "[n]ew engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower" and those from (B) "[n]ew locomotives or new engines used in locomotives." 42 U.S.C. § 7543(e)(1)(A)–(B).

75.    Subdivision (e)(2) applies to all other nonroad sources.

76.   Subparagraph (e)(2)(A) works by granting California—and only California—a limited power "to adopt and enforce standards and other requirements relating to the control of emissions from" "any" nonroad source.

77.   Subparagraph (e)(2)(B), working in tandem with subparagraph (e)(2)(A), applies to all states "other than California."

78.   Those states, the provision explains, may impose standards on nonroad sources only if those standards "are identical, for the period concerned, to the California standards authorized by the [EPA] Administrator under subparagraph (A)." 42 U.S.C. § 7543(e)(2)(B).

79.   Taken together, subparagraphs (e)(2)(A) and (e)(2)(B) cast a strong preemptive force over the states. As courts have explained: every state besides California is "preempted from adopting any regulation for which California could receive authorization." *Engine Mfrs. Ass'n*, 88 F.3d at 1087; *see also Jensen Fam. Farms*, 644 F.3d at 939; *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 735 (9th Cir. 2010).

80.   Subparagraph (e)(2)(B) applies only to "standards" that control emissions, however.

81.   A standard is something that requires a source of pollution to not "emit more than a certain amount of a given pollutant," to "be equipped with a certain type of pollution-control device," or to "have some other design feature related to the control of emissions." *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004).

14

82.     In brief, then: states generally cannot limit emissions from nonroad sources unless California has already (and identically) done so.

83.     Thus to meet a NAAQS, states are option-limited and often required out of necessity to regulate emissions only from stationary sources.

*DNR's Title V Stationary-Source Permitting Regime*

84.     The Wisconsin State Legislature—not unlike legislatures across the nation—has delegated to the executive branch its power to develop stationary-source emissions standards. *See* Wis. Stat. ch. 285.

85.     DNR, an arm of the state's executive branch, exercises that regulatory power. Wis. Stat. § 285.01(13).

86.     Although DNR has wide latitude in *setting* stationary-source emissions standards, it is restrained in how it can enforce those standards.

87.     The frontiering achievement of the 1990 amendments, Title V of the CAA dictates one means for states to enforce their stationary-source standards: a state-run permitting program. Claudia Copeland, Cong. Rsch. Serv., RL33632, *Clean Air Permitting: Implementation and Issues*, 1 (2016); *see generally* 42 U.S.C. § 7661; *see also* Congressional Research Service, *Clean Air Permitting: Implementation and Issues* at 2, https://crsreports.congress.gov/product/pdf/RL/RL33632.

88.     Under this Title V scheme, states must issue construction permits and operation permits to all the major[8] stationary sources within their borders. *See*  42

---

[8] "Major source" is a CAA term of art—a label encompassing any stationary source defined either as a "major source" under 42 U.S.C. § 7412 or as a "major stationary source" under 42 U.S.C. § 7602. 42 U.S.C.§ 7661(2)(A)–(B).                    (*continued on next page...*)

U.S.C. § 7661; 40 C.F.R. § 51.160(a)(1–2); 40 C.F.R. § 70.1(b); *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1355–56 (5th Cir. 1996) ("The CAA statutory scheme contemplates at least two different types of air permits unhappily named 'preconstruction permits' and 'operating permits.'").

89.    To work, those permits are required to lay out "plans and schedules" for limiting and keeping down a stationary source's emissions. DNR, *Wisconsin Air Pollution Control Operation Permit Application Instructions* (*Permit Instructions*) at 3, https://widnr.widen.net/view/pdf/gxjjxxiwaa/AM300.pdf?t.download=true.

90.    In line with this congressional dictate, Wisconsin law requires that every major stationary source of air pollution receive a construction permit not only before that source is built but also whenever it is modified. Wis. Stat. § 285.60(1)(a); Wis. Admin. Code § NR 406.03(1); *but see* Wis. Admin. Code § NR 406.04 (listing sources exempted from this permitting requirement).

91.    To then operate, the source must receive an "air pollution control operation permit." Wis. Stat. § 285.60(1)(b), (3)(a); Wis. Admin. Code § NR 407.01;

---

Section 7412 defines "major source" as any stationary source "that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C § 7412(a)(1). "Hazardous air pollutants," shortened to "HAPs," refers to the 188 pollutants listed in 42 U.S.C § 7412(b)(1).

Section 7602 defines "major stationary source" as any stationary facility that "directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7602(j).

The Wisconsin permitting requirements described in this complaint do not apply to stationary sources that are not major sources.

*but see* Wis. Admin. Code § NR 407.03 (listing sources exempted from this permitting requirement).

92.     Both types of permits cost big sums.

93.     To obtain a construction permit, a facility must pay thousands of dollars. Wis. Admin. Code § NR 410.03. And to obtain an operation permit, a facility must pay at least hundreds of dollars (though in many instances the amount eclipses one thousand). Wis. Stat. § 285.69(2e), (2m).

94.     An operation permit is valid "for a maximum of five years" before it must be renewed. *Permit Instructions* at 12.

95.     Facilities must also prove their own compliance with their permits' terms—and pay for all equipment needed to collect the proof. *Permit Instructions* at 3 (explaining that facilities must "[i]mplement a compliance monitoring program and report monitoring results" to DNR).

96.     All those costs high to begin with, the true cost of compliance is even higher still: manufacturers must often pay attorneys and consultants many thousands to help get, keep, and renew these permits.

97.     These permits are required for all major air-polluting sources that fit the definition of "stationary source." *See* Wis. Stat. § 285.60(1)(a)1.; Wis. Admin. Code §§ NR 406.01(1), 407.01(1).

98.     Under state statute, "stationary source" refers to:

[Any] facility, building, structure or installation that directly or indirectly emits or may emit an air contaminant only from a fixed location. A stationary source includes an air contaminant source that is capable of being transported to a different location. A stationary source

> may consist of one or more pieces of process equipment, each of which is
> capable of emitting an air contaminant. A stationary source does not
> include a motor vehicle or equipment which is capable of emitting an air
> contaminant while moving.

Wis. Stat. § 285.01(41).

99.     DNR is interpreting and applying this definition incorrectly and
unlawfully, reading it to include certain engines that are not stationary sources but
nonroad engines under federal law.

*DNR's Illegal Regulatory Conduct*

100.     In 2021, DNR issued a draft technical support document entitled
"Addressing Mobile and Nonroad Engine Testing Operations in Stationary Source
Permitting." (Ex. 1.) In that document, DNR stated it had power under both "state
and federal law" to regulate:

–   Emissions from engine test cells/stands for performance testing of
    uninstalled engines, no matter the type of equipment the engine will
    eventually be installed in.

–   Emissions from operation of partially assembled motor vehicles and
    other nonroad equipment prior to being introduced into commerce,
    because the partially assembled equipment is similarly immobile
    and not capable of emitting while moving.

–   Emissions from fully or partially assembled motor vehicles and other
    nonroad equipment that will not be introduced into commerce. . . .
    Examples include:

    o   Engines being tested for research and development.

    o   Engines being tested for quality control, reliability, or
        diagnostics.

    o   Other engine testing where the equipment is not destined to
        be introduced into commerce.

18

(Ex. 1 at 6–7.)

101.    To reach that conclusion, DNR read the definitions of "nonroad engine" in 42 U.S.C. § 7550 and 40 C.F.R. § 1068.30(1)(i)–(iii) to exclude nonroad engines that are turned on and tested by their manufacturer. (Ex. 1 at 3–4.)

102.    It also read those definitions to exclude any nonroad engines that are "not installed or integrated into a final product"; that have not or will not be "introduced into commerce"; or that are not, in their current state, "capable of emitting while moving." (Ex. 1 at 4–7.)

103.    DNR exempted all those nonroad engines from the meaning of "nonroad engine" even though no (federal) law suggests those engines are so exempt.

104.    DNR then interpreted the definition of "stationary source" in Wis. Stat. § 285.01(41) to include those nonroad sources it exempted. (Ex. 1 at 6–7.)

105.    Following that reasoning, DNR concluded those emissions listed in para. 100 to be under the control of its stationary-source permitting power. (Ex. 1 at 6–7.)

106.    While DNR never finalized that technical support document,[9] it has nonetheless enforced the policies in it, as it has for over four decades. (Ex. 2 at 4.)

107.    And since issuing the document, DNR has continued to use stationary-source permits to limit emissions from those sources identified above.

108.    Because DNR is enforcing this policy, it is imposing emissions limits on nonroad engines.

---

[9] After issuing the draft, DNR took public comments. WMC—alongside attorneys, interest groups, and an engine manufacturer—submitted written comments. DNR responded to each comment in a written memorandum included with this complaint. *See* Ex. 2.

109.    Exhibit 6 is a stationary-source operation permit DNR issued to a nonroad-engine manufacturer.[10] That permit imposes emissions standards on engines tested in dynamometers[11] and other test stands.[12] (Ex. 6 at 32–43.)

110.    Exhibit 7 is another stationary-source operation permit DNR issued to a different nonroad-engine manufacturer. That permit imposes emissions standards on nonroad engines tested during research and development. (Ex. 7 at 41.)

111.    DNR has issued other permits like Exhibit 6 and Exhibit 7.[13] Those permits too impose emissions standards on nonroad engines during the manufacturing process.[14]

---

[10] WMC presents Exhibits 6–8 merely to show through example how DNR regulates nonroad sources in the state. WMC challenges none of the specific standards in those permits. All Title V permits issued by the DNR are publicly available, at https://apps.dnr.wi.gov/warp_ext/AM_PermitTrackingSearch.aspx.

[11] A dynamometer is a piece of equipment that manufacturers use to measure an engine's torque and other marketable specifications. *See Kroon v. Maxwell*, 297 F. Supp. 277, 279 (E.D. Pa. 1969), *aff'd*, 423 F.2d 680 (3d Cir. 1970) (describing a dynamometer as "a mechanical device designed to measure horsepower," a figure that can be calculated from torque).

[12] "An engine test cell/stand is any apparatus used for testing uninstalled stationary or uninstalled mobile (motive) engines." National Emission Standards for Hazardous Air Pollutants: Engine Test Cells/Stands Residual Risk and Technology Review, 83 Fed. Reg. 20208 (proposed May 8, 2019).

[13] Exhibit 8 is a permit regulating still another manufacturer. More examples of preempted standards are highlighted throughout that exhibit.

[14] Manufacturers test engines many ways, using many types of equipment at many times throughout the manufacturing process. *See, e.g.*, Ex. 2 at 9–10 (describing run-off testing, test-cell testing, and certain forms of research-and-development testing). DNR effectively maintains that it has the power to regulate any nonroad engine whenever (and however) a manufacturer tests that engine.

## Cause of Action

## Count 1: Declaratory and Injunctive Relief

*42 U.S.C. § 7543(e)(2)(B) preempts DNR from imposing emissions standards on nonroad engines while a manufacturer tests those engines.*

112.    Plaintiff realleges and incorporates all the preceding allegations.

113.    DNR's above-described conduct—regulating nonroad sources with construction and operation permits required for stationary sources—is preempted under 42 U.S.C. § 7543(e)(2)(B) if it (1) imposes a "standard" that is (2) not identical to one for which California has received EPA approval and (3) does so on "nonroad vehicles or engines."

114.    All three conditions are present here, so DNR's conduct is preempted.

115.    To the first condition: DNR's permitting requirements are standards because they dictate that certain "vehicle[s] or engine[s] must not emit more than a certain amount of a given pollutant." *Engine Mfrs. Ass'n*, 541 U.S. at 253.

116.    Exhibit 6, for example, limits carbon monoxide (CO) emissions from nonroad engines tested in "[t]hree dynamometer engine testing stations." (Ex. 6 at 39–40.) Those engines, the permit dictates, may emit no more than "31.7 pounds per hour" through one stack, "13.2 pounds per hour" through another stack, and "79.2 pounds per hour" through yet one more. (Ex. 6 at 40.)

117.    Exhibit 6 also imposes CO standards on nonroad engines running in a group of "wet test cells." (Ex. 6 at 37.) Those engines' "[c]arbon monoxide emissions" through two stacks "may not exceed 221.8 pounds per hour total." (Ex. 6 at 37.)

118.    Exhibit 7—regulating a different manufacturer—imposes standards on engines tested during research and development. This permit limits particulate matter (PM) emissions from certain stacks to at most "0.40 pounds per 1,000 pounds of gas." (Ex. 7 at 41.)

119.    DNR itself concedes that its stationary-source permits limit emissions from sources WMC alleges to be nonroad engines. (Ex. 1 at 1.) In its response to public comments on its draft technical support document, DNR emphasized that its permits reduce both carbon monoxide and nitrogen oxide emissions. (Ex. 2 at 2.)

120.    DNR's policy therefore imposes "standards" on emissions.

121.    The second condition is also fulfilled: EPA has not authorized California to impose standards "identical to" the ones DNR is imposing here.

122.    The third condition is likewise met: DNR's unique policy imposes standards on "nonroad sources," as defined in 40 C.F.R. § 1068.30(1)(i)–(iii).

123.    As explained in paras. 64–66, 40 C.F.R. § 1068.30(1)(i) and (ii) each define the term "nonroad engine." Those definitions contain both a present-looking and a forward-looking perspective. Present-looking because they contemplate engines that *currently* fit their criteria. And forward-looking because they contemplate engines that, although not currently doing so, will *someday* fit their criteria.

124.    DNR's policy ignores the forward-looking aspect of 40 C.F.R. § 1068.30(1)(i) and (ii). As a result, the policy applies to many nonroad engines.

125.    DNR also misconstrues 40 C.F.R. § 1068.30(1)(iii).

126.   That provision asks only whether an engine "is designed to be" and is "capable of being carried or moved"—*whatever its current location, condition, or state*. 40 C.F.R. § 1068.30(1)(iii).

127.   Construing and applying this provision, DNR asks two incorrect (almost inverse) questions. First: whether an engine *is currently*—whatever its design and capabilities—immobile. Second: whether the structure to which the engine *is currently attached*—never mind all the structures to which it is designed to be and capable of being attached—allows the engine to be carried or moved.

128.   Even though 40 C.F.R. § 1068.30(1)(iii) justifies neither of those inquiries, DNR uses both to classify sources.

129.   As a result, many engines that are rightly nonroad engines according to EPA are stationary sources according to DNR.

130.   DNR concedes this error in its draft technical support document. Stationary-source permits, it writes, "include[ ] emissions from all types of engine testing, including testing *of nonroad vehicles and equipment*." (Ex. 1 at 1 (emphasis added).)

131.   But emissions from nonroad engines are never emissions from stationary sources—regardless of how or when those emissions generate.

132.   All emissions from "nonroad engines" as defined in 42 U.S.C. § 7550(10) and 40 C.F.R. § 1068.30(1)(i)–(iii) must be treated just so: as emissions from nonroad engines.

133. Thus to the extent DNR imposes standards on emissions from "nonroad engines" as defined in 40 C.F.R. § 1068.30(1)(i)–(iii), DNR imposes standards on nonroad engines—not on stationary sources, as DNR contends.

134. This analysis agrees with guidance from at least two EPA enforcement regions. Both Region 5 (in which Wisconsin is located) and Region 7 (in which Iowa is located) have determined already that similar emissions generated during product testing are "direct emissions from [ ] certified nonroad engine[s]" and so are "not stationary source emissions." (Ex. 4 at 1); *see also* Ex. 3 at 1 (stating the same principle).

135. In sum: 42 U.S.C. § 7543(e)(2)(B) preempts DNR's regulatory conduct insofar as DNR imposes on "nonroad engines" "standards" not adopted by California.

136. Unless this Court grants the relief WMC seeks, DNR will continue to enforce a federally preempted policy.

137. That means DNR will continue its tornadic intrusion on EPA's exclusive domain—and manufacturers will stay stuck in a bi-regulatory field the CAA was designed to prevent.

### Request for Relief

Plaintiff requests the following relief:

(i) A declaration that any engine meeting the criteria in 42 U.S.C. § 7550(10) or 40 C.F.R. § 1068(1)(i), (ii), or (iii) is a nonroad engine even if it is undergoing testing by a manufacturer, has not yet been

installed or integrated into a final product, or will not be introduced into commerce.

(ii)    A declaration that 42 U.S.C. § 7543(e)(2)(B) preempts DNR Secretary-Designee Karen Hyun from imposing standards on emissions from any nonroad engine as defined by 42 U.S.C. § 7550(10) and 40 C.F.R. § 1068(1)(i), (ii), or (iii).

(iii)   An order permanently enjoining DNR Secretary-Designee Karen Hyun from imposing and enforcing emissions standards on engines fitting the definition of a "nonroad engine" in 42 U.S.C. § 7550(10) or 40 C.F.R. § 1068.30(1)(i), (ii), or (iii)—unless those emissions standards are exempted from preemption under 42 U.S.C. § 7543(e)(2)(B).

(iv)    An order awarding WMC costs or attorney fees—or both—as authorized by law.

Dated this 28th day of February 2025.

Respectfully submitted,

/s/ Nathan J. Kane

Nathan J. Kane
Wis. Bar. No. 1119329
Scott E. Rosenow
Wis. Bar No. 1083736
WMC Litigation Center
501 East Washington Avenue
Madison, Wisconsin 53703
(608) 893-2082
nkane@wmc.org
srosenow@wmc.org

25

*Attorneys for Wisconsin Manufacturers and Commerce Inc.*