IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN MANUFACTURERS AND
COMMERCE, INC.,

       Plaintiff,

       v.                          Case No. 25-CV-0155

KAREN HYUN, Secretary-Designee of
the Wisconsin Department of Natural
Resources, in her official capacity,

       Defendant.

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

---

JOSHUA L. KAUL
Attorney General of Wisconsin

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904 (GJK)
(608) 266-9226 (FRC)
(608) 294-2907 (Fax)
gabe.johnson-karp@ wisdoj.gov
frances.colbert@wisdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ...................................................................5

BACKGROUND ...................................................................8

I.    The Clean Air Act separately regulates stationary and mobile source emissions. ..............................................8

    A.    Background. .......................................................8

    B.    Current law governing stationary source and mobile source emissions. ............................................... 10

        1.    Statutes and regulations defining stationary source. ......................................................... 11

        2.    Statutes and regulations governing nonroad and mobile engines. .......................................... 12

II.    DNR issues a draft "technical support document," seeks comments, and ultimately declines to issue any final guidance or promulgate a formal administrative rule. .............. 15

III.    WMC challenges DNR's four-year-old draft guidance document. ....................................................... 18

STANDARDS GOVERNING MOTIONS TO DISMISS .................................. 18

ARGUMENT ................................................................... 20

I.    This Court lacks jurisdiction over WMC's complaint challenging DNR's draft guidance document. ............................. 20

    A.    WMC lacks standing to challenge DNR's draft guidance. ......................................................... 21

        1.    To invoke federal jurisdiction, a plaintiff must show an injury caused by the government's action, and that a favorable judgment will redress that injury. .................................... 21

            a.    Injury in fact. .................................. 22

b.    Causation. ........................................................ 23

c.    Redressability. ................................................. 23

d.    Additional principles of standing for organizations. ................................................ 24

2.    DNR's draft guidance does not cause any injury to WMC or any identified member of the organization, nor would the requested declaration or injunction afford WMC or its members any redress. ............................................ 27

a.    WMC fails to allege any actual or imminent injury that it or its members have suffered. ................................................... 28

b.    With no injury, WMC also cannot establish causation or redressability. ............. 32

B.    WMC's challenge to DNR's guidance does not present a ripe controversy. ............................................................ 34

1.    Ripeness is a jurisdictional requirement that ensures that federal courts address only live cases or controversies. ................................................ 34

2.    The draft guidance does not present a ripe controversy. ................................................................. 39

C.    WMC's challenge to DNR's draft guidance does not arise under federal law. ........................................................ 42

1.    Federal jurisdiction requires a case "arising under" federal law; the Declaratory Judgment Act does not create a federal cause of action sufficient for federal jurisdiction. ............................... 42

2.    WMC's request for a declaration and injunction about DNR's draft guidance does not arise under federal law. ................................................................. 44

II.    The complaint fails to state a claim because DNR's draft guidance does not purport to regulate mobile sources and

thus is not preempted by the Clean Air Act's mobile-source preemption provisions. ................................................................... 49

    A.    The CAA generally preempts states from regulating emissions from mobile sources, including emissions from "nonroad engines" and "nonroad vehicles." .............. 50

    B.    The Clean Air Act does not preempt DNR's draft guidance because the guidance exclusively addresses emissions from stationary sources. .................................... 51

        1.    The text of the draft guidance pertains to emissions from stationary sources, not mobile nonroad sources. ......................................................... 52

        2.    Case law confirms that DNR's guidance pertains to stationary, not mobile, sources and that the guidance is not preempted. ....................................... 55

        3.    The presumption against preemption supports reading DNR's guidance as applying to stationary sources. ................................................... 59

    C.    The permits on which WMC relies illustrate that DNR is not unlawfully regulating mobile sources. ..................... 61

CONCLUSION ............................................................................... 64

## INTRODUCTION

This case involves Wisconsin Manufacturers & Commerce, Inc.'s challenge to a nonfinal, nonbinding guidance document that the Wisconsin Department of Natural Resources issued in 2021. The complaint should be dismissed for lack of jurisdiction or, if not, because WMC fails to state a claim.

First, WMC lacks standing. The guidance document that it challenges is DNR's explanation of how the agency planned to approach air pollution permitting in certain factual circumstances, but it imposes no obligations, sets no standards, and binds no one. This nonbinding guidance does not—indeed, cannot—injure WMC, and the group therefore lacks standing to challenge the document. The same would go for any members of the organization, although WMC doesn't even try to identify any impacted members. With no injury to speak of, causation and redressability also are lacking.

If the Court would move past standing, WMC's challenge also is, at best, unripe. Assuming the guidance could ever be implemented or enforced against anyone, that hasn't happened and there's no indication it would happen anytime soon. WMC thus seeks nothing more than an advisory opinion, and its challenge should be dismissed for lack of ripeness.

And if the Court also moves past that jurisdictional problem, there's still another: WMC's challenge to the guidance does not arise under federal law. The complaint seems to suggest that jurisdiction exists because WMC claims

that the guidance document is preempted by federal law, but merely uttering the term "preemption" is insufficient to confer federal jurisdiction. Even with its reference to preemption, WMC's challenge to DNR's document doesn't arise under the Declaratory Judgment Act, the Supremacy Clause, the Clean Air Act, or any other federal law.

Beyond these fatal jurisdictional defects, WMC's complaint fails to state a claim and can be dismissed on that basis (which the Court need address only if it moves beyond jurisdiction).

WMC's theory is that DNR's draft guidance document unlawfully regulates emissions from mobile-nonroad sources—think lawnmowers, ATVs, chainsaws. Under the federal Clean Air Act, generally only the federal government can set "standard[s] or other requirement[s] relating to the control of emissions *from* . . . nonroad engines or nonroad vehicles." 42 U.S.C. § 7543(e)(1). States are therefore preempted from regulating emissions from such mobile engines or vehicles.

Setting aside the threshold problem for WMC—that, because the guidance is nonbinding, it doesn't set any standards or requirements *at all*— the guidance also is not preempted because it says nothing about regulating emissions *from* mobile-nonroad sources. Rather, the guidance is about emissions *from* stationary sources, so the federal preemption provision isn't implicated. Here's why:

Picture a lawnmower factory. At the factory, there are "test stands" where future lawnmower engines are run and tested, and then replaced by the next engines to be tested, and then another, and another. Emissions from those test stands are then vented through stacks at the factory. DNR's guidance pertains to emissions from those stacks; they don't do anything to regulate emissions from the individual engines.

Federal law treats these sorts of test-stand emissions as emissions from the stationary source. DNR's guidance merely explains that Wisconsin will do the same in an appropriate permitting situation.

So WMC is incorrect when it asserts that DNR's guidance regulates emissions from mobile sources. Because the guidance is about stationary sources, it's not preempted, and WMC's complaint fails to state a claim.

The complaint should be dismissed for lack of jurisdiction but, if not, because it fails to state a claim on which relief may be granted.

## BACKGROUND

I.    **The Clean Air Act separately regulates stationary and mobile source emissions.**

A.    **Background.**

The federal-state partnership in the "struggle against air pollution" began over six decades ago.[1] *Engine Mfrs. Ass'n v. U.S. EPA*, 88 F.3d 1075, 1078 (1996) (quotation omitted). At its inception, the partnership consisted primarily of federal research and direction and state action. *Id*. The precursor to the CAA, the Air Quality Act of 1967, "required states to set ambient air quality standards for each air quality control region" and "directed the states to adopt implementation plans explaining how they would improve the air quality to meet the standards they had established." *Id*. The CAA and its amendments in the 1970s granted the federal government authority to set national ambient air quality standards (NAAQS) and required the states to submit state implementation plans (SIPs) for achieving those standards.[2]

---

[1] For an overview of the evolution of the Clean Air Act, *see Evolution of the Clean Air Act,* U.S. Env't Prot. Agency, https://www.epa.gov/clean-air-act-overview/evolution-clean-air-act (last visited May 14, 2025).

[2] The CAA directs the federal government to establish and periodically review National Ambient Air Quality Standards ("NAAQS") "for any pollutant the 'emissions of which . . . cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.'" *Am. Trucking Ass'ns., Inc. v. EPA*, 283 F.3d 355, 358 (D.C. Cir. 2002) (quoting 42 U.S.C. § 7408(a)(1)(A)).

Once EPA establishes NAAQS for a particular pollutant, those standards "become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration." *Id*. States' principal role in meeting

*Id.* Then as now, states maintained the "primary responsibility" for improving air quality. 42 U.S.C. § 7401(a)(4).

The regulation of motor vehicles – significant sources of pollution – however, has long been "principally a federal project," given their continual movement across state lines. *Engine Mfrs. Ass'n,* 88 F.3d at 1078. In the late 1950s and early 1960s, various states adopted differing standards regulating emission from motor vehicles. *Id.* In response, Congress developed a federal regulatory scheme, including express federal preemption of state regulation of motor vehicles, because of the "chaos" that would ensue if manufacturers, dealers, and users had to contend with 50 different vehicle emissions control requirements.[3] *Id.*; *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (discussing the history of vehicle emissions control). Thus, the CAA's regulatory scheme involves state regulation of emissions from "stationary sources," *see* Title I of the CAA, 42 U.S.C. §§ 7401–7515;

_____

the NAAQS is through the regulation of stationary sources, as set forth in each state's "state implementation plan" (SIP), or, if necessary, through a "federal implementation plan" (FIP) for states that do not submit an adequate SIP. *See* 42 U.S.C. §§ 7509, 7510(c).

[3] Because of California's unique air pollution problems and its early efforts to control them, Congress exempted California from the federal preemption statutes. Thus, "[t]he effect of the Clean Air Act is that motor vehicles manufactured for sale in the United States must be either "federal cars"— certified to meet federal vehicle emission standards as set by the EPA — or "California cars"— certified to meet that state's standards." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Env't Conservation*, 17 F.3d 521, 526–27 (2d Cir. 1994). Other states may adopt California standards, if authorized to do so by EPA. 42 U.S.C. 7543(a).

and federal regulation from "mobile sources," *see* Title II of the CAA, 42 U.S.C. §§ 7521–7590.

Before the 1990 Amendments to the CAA, motor vehicles were the only mobile sources expressly covered under the CAA. *Engine Mfrs. Ass'n,* 88 F.3d at 1080. The 1990 Amendments added "nonroad engines" and "nonroad vehicles" to the mobile-source regulatory scheme. *Id.* Congress did not, however, "alter the basic structures of the Titles I and II governing the federal-state partnership over attainment of the NAAQSs." *Id.* Like the express prohibition against state regulation of motor vehicle emissions, the 1990 Amendments contained an express provision prohibiting states from regulating mobile non-road source emissions as well.[4] *Id.* at 1081; 42 U.S.C. 7543(e).

**B.    Current law governing stationary source and mobile source emissions.**

This case involves WMC's claim that Wisconsin is unlawfully regulating emissions from certain *stationary* sources, which WMC believe should be treated as emissions from *mobile* sources. (*See* Dkt. 1-3:21–23.) The CAA and

---

[4] Like the CAA's statutory regime governing regulation of motor vehicles, the mobile nonroad source statute preempts state regulation of emissions from mobile nonroad sources, while also authorizing California to adopt its own standards, which other states may then choose to adopt. *See* 42 U.S.C. § 7543(e).

associated regulations separately address emissions from stationary and mobile sources.

### 1. Statutes and regulations defining stationary source.

Under Title I of the CAA, "stationary source" means "generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title." 42 U.S.C. § 7602(z). The term "stationary source" thus encompasses all emissions sources except those from motor vehicles or those from defined "nonroad engine[s] or nonroad vehicle[s]." *See id.*

An implementing regulation under Title I's National Emission Standards for Hazardous Air Pollutants (NESHAP) program illustrates how that stationary source program regulates certain emissions from "uninstalled mobile and stationary emissions." *See* 40 C.F.R. subpt. PPPPP. This subpart, which applies at major stationary sources, *see* 40 C.F.R. § 63.9280, governs emissions from "engine test cells/stands," which is "any apparatus used for testing uninstalled stationary or uninstalled mobile (motive) engines." 40 C.F.R. § 63.9285(a). Emissions from these test cells/stands are to be included in and covered by stationary source permits. *See* 40 C.F.R. § 63.9300. Although the NESHAP regulations exempt certain emissions from inclusion in

the permit limits for the stationary source, *see* 40 C.F.R. § 63.9290,[5] the regulations make clear that the emissions source is nonetheless a "stationary source." *See* 40 C.F.R. 63.9285.

Wisconsin in turn defines a "stationary source" as "any facility, building, structure or installation that directly or indirectly emits or may emit an air contaminant only from a fixed location." Wis. Stat. § 285.01(41). The definition recognizes that a "stationary source" "includes an air contaminant source that is capable of being transported to a different location," and that the source "may consist of one or more pieces of process equipment, each of which is capable of emitting an air contaminant." *Id*. The Wisconsin definition also confirms, in accordance with the CAA, that a stationary source "does not include a motor vehicle or equipment which is capable of emitting an air contaminant while moving." *Id*.

### 2. Statutes and regulations governing nonroad and mobile engines.

Section 7550, in Title II's mobile source regulatory regime, defines "nonroad engines" as an internal combustion engine (including the fuel system) that is not used in a motor vehicle or a vehicle used solely for competition; and

---

[5] These exempted emissions include those from testing of small engines (less than 25 horsepower) and those "used in research and teaching activities at facilities that are not engaged in the development of engines or engine test services for commercial purposes." 40 C.F.R. § 63.9290(c), (d)(3).

"nonroad vehicles" as "a vehicle that is powered by a nonroad engine and that is not a motor vehicle or a vehicle used solely for competition." 42 U.S.C. 7550 (10)–(11).

An implementing regulation, 40 C.F.R. § 1068.30(1), further defines nonroad engines as an internal combustion engine meeting any of the following criteria:

> (i) It is (or will be) used in or on a piece of equipment that is self-propelled or serves a dual purpose by both propelling itself and performing another function (such as garden tractors, off-highway mobile cranes and bulldozers).

> (ii) It is (or will be) used in or on a piece of equipment that is intended to be propelled while performing its function (such as lawnmowers and string trimmers).

> (iii) By itself or in or on a piece of equipment, it is portable or transportable, meaning designed to be and capable of being carried or moved from one location to another. Indicia of transportability include, but are not limited to, wheels, skids, carrying handles, dolly, trailer, or platform.

The regulation, however, also explicitly excludes certain internal combustion engines from the category of "nonroad engines." 40 C.F.R. § 1068.30 (nonroad engine)(2). Most relevant here is the following:

> (2) An internal combustion engine is not a nonroad engine if it meets any of the following criteria:

> (i) The engine is used to propel a motor vehicle, an aircraft, or equipment used solely for competition.

> (ii) The engine is regulated under 40 CFR part 60, (or otherwise regulated by a federal New Source Performance Standard promulgated under section 111 of the Clean Air Act (42 U.S.C. 7411)). Note that this

criterion does not apply for engines meeting any of the criteria of paragraph (1) of this definition that are voluntarily certified under 40 CFR part 60.

(iii) The engine otherwise included in paragraph (1)(iii) of this definition remains or will remain at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source. A location is any single site at a building, structure, facility, or installation. For any engine (or engines) that replaces an engine at a location and that is intended to perform the same or similar function as the engine replaced, include the time period of both engines in calculating the consecutive time period. An engine located at a seasonal source is an engine that remains at a seasonal source during the full annual operating period of the seasonal source. A seasonal source is a stationary source that remains in a single location on a permanent basis (i.e., at least two years) and that operates at that single location approximately three months (or more) each year. See § 1068.31 for provisions that apply if the engine is removed from the location.

40 C.F.R. § 1068.30 (nonroad engine)(2).

Wisconsin does not have a separate statutory definition for mobile sources apart from the exception within the definition of "stationary source," which provides that "stationary source" "does not include a motor vehicle or equipment which is capable of emitting an air contaminant while moving." Wis. Stat. § 285.01(41). The Wisconsin Administrative Code defines "mobile source" as "any motor vehicle, vessel, aircraft or equipment other than a semistationary source which is capable of emitting any air contaminant while moving or idling on the ground or in the water." Wis. Admin. Code NR § 400.02(98). This includes "automobiles, motorcycles, trucks, buses, snowmobiles, motorboats, steamships, earthmoving equipment, locomotives and aircraft." *Id.*

## II.    DNR issues a draft "technical support document," seeks comments, and ultimately declines to issue any final guidance or promulgate a formal administrative rule.

This case relates to DNR's issuance of a "technical support document" related to emissions from the manufacture of nonroad engines, equipment, and vehicles, and how those emissions factor into stationary source permitting for the manufacturing facilities. (*See* Dkt. 1-3.)

DNR issued the draft technical support document (hereafter, "guidance document") on June 24, 2021. (*See* Dkt. 1-3.) At that time, DNR had received multiple requests from small engine manufacturers to revise their air pollution control operation permits to remove nonroad engine testing and equipment checks. (Dkt. 1-3:1.) DNR also was aware that the EPA had issued guidance to several manufacturers suggesting that emissions from the manufacturing of combustion engines may, in some circumstances, be excluded from stationary source permitting. (*See* Dkt. 1-3:1.)  As a result of the permit-change requests and EPA's recent guidance letters, DNR began to reassess the internal guidance on which it had previously made permitting determinations, to "ensure consistency and accuracy in responding to permit applications." (Dkt. 1-4:4.) After reviewing and assessing its processes, EPA's rationale, and the governing provisions of the CAA, DNR issued the draft guidance document. (Dkt. 1-3:1.)

15

In short, the draft guidance stated that DNR has long viewed emissions from uninstalled engines immobilized in test cells/stands as emissions from stationary sources, and that, where appropriate in future stationary-source permitting decisions, the agency would include such emissions in a facility's stationary-source permit. (*See* Dkt. 1-3:6.) The draft guidance considered immobilized engines as those which are not "capable of emitting an air contaminant while moving" and therefore not mobile sources. (Dkt. 1-3:6); *see also* Wis. Stat. § 285.01(41). This conclusion was informed, in large part, by the federal regulations governing test cells/stands under the NESHAP regulations. (*See* Dkt. 1-3:4–7); *see also* 40 C.F.R. §§ 63.9280–.9300.

Similarly, the draft guidance explained that partially assembled engines, before they're introduced into commerce, also are immobile and not "capable of emitting an air contaminant while moving." (Dkt. 1-3:6); Wis. Stat. § 285.01(41). DNR concluded that emissions from these immobile engines were proper to include in stationary-source permitting. (Dkt. 1-3:6.) Likewise, the draft guidance explained that emissions from engines that were not intended to be introduced into commerce (*e.g.* those used for testing for research and development, quality control, reliability, or diagnostics) also would be considered emissions within stationary-source permitting. (Dkt. 1-3:6.)

DNR noticed the draft guidance document for public input and held a stakeholder meeting to receive questions and comments. (*See* Dkt. 1-4:1). The

agency received written comments from a variety of stakeholders, including plaintiff WMC. (Dkt. 1-4).

As a result of the public input, DNR "decided to withdraw the draft [guidance document]." (Dkt. 1-4:4.) DNR explained that it would proceed by making "case specific determinations" regarding future stationary source permitting applications. (*See* Dkt. 1-4:4.) The agency explained that it "decided to withdraw the draft [guidance] in part because of the variety of terms and operations and wide variety of nonroad equipment and products manufactured in Wisconsin." (Dkt. 1-4:3.) Proceeding on a case-by-case basis, DNR explained, would allow the agency to base its permitting decisions "on the source specific descriptions of operations supplied in a permit application." (Dkt. 1-4:3.)

DNR also encouraged applicants seeking modifications to their permits to "fully describe operations proposed for removal in the request and explain why the operations should not be considered part of the stationary source." (Dkt. 1-4:3.) The agency's response to comments made clear that, where supported by case-specific facts, it would consider requests to remove certain emissions sources from a source's stationary permit, including emissions from "both fully and partially assembled products that are intended for sale as nonroad engines or equipment" as well as emissions from certain types of engines tested for research and development purposes. (Dkt. 1-4:3, 6.)

### III. WMC challenges DNR's four-year-old draft guidance document.

WMC is a "business trade association" that "advocates laws and policies enabling businesses and economic investment to flourish" (Dkt. 1:5.) Four years after DNR issued its draft guidance and three years after the agency declined to finalize that guidance, WMC filed this lawsuit challenging the guidance document. (*See* Dkt. 1.) The group argues that the draft guidance unlawfully imposes standards on emissions from mobile sources and is therefore preempted by federal law. (Dkt. 1:21–25.)

WMC does not allege that it has been unlawfully regulated. Instead, the group alleges that the existence of the draft guidance constitutes a "tornadic intrusion on EPA's exclusive domain" of regulating mobile sources, and that unidentified members of the group "have been affected by DNR's regulation of emissions from nonroad sources." (Dkt. 1:6–7, 24.) And while WMC cites multiple permits in which it believes DNR unlawfully regulated stationary sources, none of those permittees joins this lawsuit, and WMC expressly disclaims any challenges to those permits, explaining that it "challenges none of the specific standards in those permits." (Dkt. 1:20 n.10.)

### STANDARDS GOVERNING MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b) authorizes motions to dismiss for lack of jurisdiction over the subject matter, *see* Fed. R. Civ. P. 12(b)(1), and failure to state a claim on which relief may be granted, *see* Fed. R. Civ. P.

12(b)(6). Where a motion to dismiss is based on both Fed. R. Civ. P. 12(b)(1) and 12(b)(6), the Court should address the jurisdictional argument first, and only if the Court is satisfied that jurisdiction exists should it address the failure-to-state-a-claim argument. *See Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy.").

"[A] plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). To determine "whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980).

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the

19

plaintiff alleges sufficient facts that would allow a court to reasonably infer that the defendant is liable for the alleged misconduct, but a court may decline to accept as true any allegations that "are no more than conclusions." *Id*. at 678–79. Although the question whether a complaint states a "plausible" claim for relief is context-dependent, a complaint must be dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679.

## ARGUMENT

WMC challenges a draft guidance document that DNR issued in 2021. The organization asserts that this Court has jurisdiction to declare that the Clean Air Act, 42 U.S.C. § 7543(e)(2)(B) preempts DNR's draft guidance. (*See* Dkt. 1:6.) WMC's complaint should be dismissed for lack of jurisdiction or, if not, because it fails to state a claim.

## I.    This Court lacks jurisdiction over WMC's complaint challenging DNR's draft guidance document.

WMC's complaint should be dismissed for lack of jurisdiction. DNR's draft guidance does not injure WMC, and the group therefore lacks standing to challenge the document in federal court. The Court separately lacks jurisdiction because WMC's challenge to DNR's guidance document does not present a ripe controversy, and because WMC's complaint does not arise under federal law.

20

**A.** **WMC lacks standing to challenge DNR's draft guidance.**

**1.** **To invoke federal jurisdiction, a plaintiff must show an injury caused by the government's action, and that a favorable judgment will redress that injury.**

"Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013). Under Article III of the U.S. Constitution, federal courts are granted jurisdiction over "cases" and "controversies." *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019). And under 28 U.S.C. § 1331, federal district courts have jurisdiction over civil actions "arising under" the Constitution, laws, or treaties of the United States. *E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 959 (7th Cir. 2021); 13D Wright & Miller, *Fed. Prac. & Proc. Juris*. § 3562 (3d ed.).

One component of the case-or-controversy requirement is standing, which requires the plaintiff to show that it (1) suffered an injury in fact; (2) "fairly traceable to the challenged conduct of the defendant"; and (3) "likely to be redressed by a favorable judicial decision." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021). Organizational plaintiffs, just like individuals, must establish standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

### a.    Injury in fact.

The injury element of standing "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381–82. The actual-injury requirement means that "a citizen does not have standing to challenge a government regulation simply because the plaintiff *believes* that the government is acting illegally," or because he or she holds a "strong moral, ideological, or policy objection to a government action." *Id.* (emphasis added). In short, "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* In this way, the injury-in-fact requirement "prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* (quoting *Allen*, 468 U.S. at 756).

To support standing, an alleged injury must be concrete and particularized, "meaning that it must be real and not abstract." *Id.* at 381–82. An injury "can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights," but it must be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* "And when a plaintiff seeks prospective

relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

### b.    Causation.

The causation requirement "screens out plaintiffs who were not injured by the defendant's action." *Id.* at 383. If causation were not a required element of standing, federal courts would be "'virtually continuing monitors of the wisdom and soundness' of government action." *Id.* (quoting *Allen*, 468 U.S. at 760). To establish causation, a plaintiff "must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385.

Where a plaintiff seeks only forward-looking relief, "past injuries are relevant only for their predictive value." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). Thus, "the past is relevant only insofar as it is a launching pad for a showing of imminent future injury," and the plaintiff bears the burden to show that imminence. *Id.*

### c.    Redressability.

"The redressability inquiry poses a simple question: 'If plaintiffs secured the relief they sought, would it redress their injury?'" *Wilderness Soc. v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996)) (citation omitted);

*see also Village of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 69–70 (D.C. Cir. 2006). To determine whether an injury is redressable, courts "consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *Murthy*, 603 U.S. at 73 (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)).

Redressability will generally be found lacking where a plaintiff attacks a governmental notice or rule *about* a topic, rather than specific applications of the rule. *See Lujan v. Defs. of Wildlife* (hereafter "*Lujan II*"), 504 U.S. 555, 568 (1992). "[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . are, even when premised on allegations of several instances of violations of law, . . . rarely if ever appropriate for federal-court adjudication." *Id.* (quoting *Allen*, 468 U.S. 759–760).

### d.    Additional    principles    of    standing    for organizations.

"Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *All. for Hippocratic Med.*, 602 U.S. at 394 (citations omitted). An organizational plaintiff "must show 'far more than simply a setback to the organization's abstract social interests,'" and cannot

establish standing "simply because they object to [the government's] actions." *Id.* (quoting *Havens*, 455 U.S. at 379).

This means that, like any individual, an organization "that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 395. Otherwise, every "organization[ ] in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* To establish organizational standing, the plaintiff organization must show that the challenged government action "directly affect[ ] and interfere[ ] with" the entity's "core business activities"— akin to "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

This often will mean that policy-advocacy organizations will not have standing to challenge governmental action that instead applies to businesses and other entities directly regulated by the government. *See Alliance for Hippocratic Med.*, 602 U.S. at 365–96. The fact other entities that might actually be injured are not challenging the government action "is not a reason to find standing." *Id.* (quoting *Schlesinger*, 418 U.S. at 227). Federal courts consistently reject assertions of standing that rests on nothing more than

the notion of "if not us, who?" *Id.*; *accord Clapper*, 568 U.S. at 420–421; *Valley Forge*, 454 U.S. at 489; *Richardson*, 418 U.S. at 179–180.

Another way an organization may establish standing is referred to as "associational standing," under which the organization must show that: (1) at least one of its members would "have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Prairie Rivers Network*, 2 F.4th at 1008.

This approach, however, does not dispense with the fundamental requirements of injury, causation, and redressability, and simply allows an injured party to, in effect, litigate through an organization of which it is a member, provided the organization directly serves the interests of the allegedly injured plaintiff. *See Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (recognizing that associational advocacy "is only appropriately—and constitutionally—undertaken on behalf of another when that other has suffered an injury"). Associational standing is thus "derivative of—and not independent from—individual standing." *Prairie Rivers Network*, 2 F.4th at 1008.

Critical to establishing associational standing is that the organization plaintiff must "identify members who have suffered the requisite harm" caused

by the challenged government action, *id.* at 1009 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498–99 (2009)), and that judicial relief would "redress [the] members' injuries"—not merely fulfill the organization's own alleged interests, *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996).

Given the burdens of adequately alleging (and eventually proving) the elements of standing, an organizational plaintiff relying on its members' alleged injuries bears the burden to show that the elements of standing are present *as to the absent member* upon whose injury standing is premised. *Lujan II*, 504 U.S. at 562. So while an organizational plaintiff *can* assert standing on behalf of injured members, "it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen*, 468 U.S. at 758); *see also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44–45 (1976); *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

> **2.    DNR's draft guidance does not cause any injury to WMC or any identified member of the organization, nor would the requested declaration or injunction afford WMC or its members any redress.**

WMC's theory of standing fails at every step of the standing analysis. The organization does not seem to assert an injury on its own behalf and instead seems to rest its claim for relief on allegations of injuries to its

"members who have been affected" by DNR's draft guidance.[6] (Dkt. 1:7.) But it fails to point to any individual member facing imminent injury from DNR's guidance. And even as to past, alleged injuries, the group fails to credibly allege that any injury was caused by the guidance, as opposed to the independent decision-making process as part of the air-permitting program. Finally, even if there were some showing of imminent injury, neither a declaration nor injunction about DNR's guidance would redress it.

### a. WMC fails to allege any actual or imminent injury that it or its members have suffered.

First and most simply, WMC cannot establish that it's been injured by DNR's guidance because, as a matter of Wisconsin law, guidance like this cannot injure anyone.

Under Wisconsin law, "guidance documents" are statutorily defined. They are "any formal or official document or communication issued by an

---

[6] WMC's complaint is unclear whether it is relying on organizational standing. It asserts that "the issue raised" in this case is "germane to WMC's purpose of opposing . . . regulation," and thus seems to imply that the organization, separate from its members, has suffered some affront that opens the federal courthouse doors. (Dkt. 1:7.)

Insofar as WMC purports to assert standing as an organization, *Food & Drug Administration v. Alliance for Hippocratic Medicine* forecloses its theory. *See* 602 U.S. 367, 395 (2024). The group's "issue advocacy" and expenditures do not constitute a cognizable injury at all, much less one caused by DNR's guidance or redressable by this Court.

As addressed in text, it also lacks standing on behalf of any of its unidentified members. And insofar as WMC reverses course in response to this motion and seeks to establish standing on its own behalf as an organization, Defendant will address those arguments in reply.

agency" that "[e]xplains the agency's implementation of a statute or rule enforced or administered by the agency," or "[p]rovides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency." Wis. Stat. § 227.01(3m)(a)1.–2.

The Wisconsin Supreme Court has explained that guidance documents "are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions." *Serv. Emps. Int'l Union, Loc. 1 v. Vos* (*SEIU*), 2020 WI 67, ¶ 102, 393 Wis. 2d 38, 101, 946 N.W.2d 35. Under Wisconsin law, these sorts of guidance documents "impose no obligations, set no standards, and bind no one." *Id.*

DNR's draft guidance falls squarely within the statutory definition of a guidance document. Wis. Stat. § 227.01(3m)(a). What's more, this guidance never proceeded past "draft" form, so it does not even rise to the level of a finalized guidance document. After receiving comments about the draft guidance, DNR decided that it "will not finalize the draft [technical support document]." (Dkt. 1-4:1.) DNR's decision to decline to finalize the guidance cuts further against any "threat" that WMC could face from the document. *See Decade*, 747 F.2d at 411.

Thus, whatever injuries WMC's members may have suffered, those injuries could not have been caused by DNR's non-binding, non-final guidance document. (*See* Dkt. 1-3:1.)

29

Despite this, WMC points to expenditures that its unidentified members incurred complying with air-permitting requirements (Dkt. 1:7), as well as emission restrictions to which those members have wrongly been subjected. WMC's allegations about expenditures and burdens fail to establish a cognizable injury for multiple reasons.

But to rely on associational standing WMC, must allege sufficient facts to show (1) which specific members are injured; and (2) how those members are injured. *See Prairie Rivers Network*, 2 F.4th at 1009–10. WMC doesn't do this, so we "do not know—based on the face of the complaint—who these members are or how exactly the [guidance document] will harm them individually." *Id.* Just like the plaintiff in *Prairie Rivers Network*, WMC "speaks of its individual members only as a collective," repeatedly referring to its "members" without a single explanation of how any member is harmed. *Id.* These types of allegations of "generalized harm to a group of individual members will not do . . . for associational standing." *Id.* at 1010.

Indeed, WMC seems to disavow any connection to individual members. (*See* Dkt. 1:20.) The group attaches three stationary source permits to its complaint, but expressly qualifies that "WMC challenges none of the specific standards in those permits." (Dkt. 1:20.) But WMC doesn't otherwise identify any specific member who was injured, so if the group isn't even purporting to challenge those entities' permits, it fails to allege facts showing "that at least

one of its members could sue in [its] own right." *Prairie Rivers Network*, 2 F.4th at 1010. WMC thus fails to show that it may sue on any members' behalf.

Relatedly, WMC also fails to allege sufficient facts to show what its members' injuries actually are. (*See* Dkt. 1:7–8.) In effect, the group's allegations are that "compliance costs exist" and the DNR is regulating unlawfully. (*See* Dkt. 1:7–8, 19–20.) But the complaint includes no allegations about what those compliance costs are, or how much of WMC or its members' costs are allegedly attributable to DNR's guidance document, as opposed to the general permitting and compliance costs that the firms otherwise incur. Because WMC does not claim that its members should be exempted from *all* air permitting—only the allegedly unlawful regulation of nonroad mobile sources—it effectively concedes that at least some of its members' compliance costs would be incurred no matter what. Without alleging what their costs are and which costs are attributable to the allegedly unlawful regulation, it fails to show any cognizable injury.

With no demonstrable physical, monetary, or property-based injury, WMC's "general legal, moral, ideological, or policy objection[s]" to the guidance document also do not demonstrate a cognizable injury. *All. for Hippocratic Med.*, 602 U.S. at 381–82. The group fails to establish injury from DNR's guidance and thus lacks standing to challenge it.

### b.    With no injury, WMC also cannot establish causation or redressability.

With no injury to speak of, WMC also necessarily cannot establish any causal connection between the guidance and any alleged injuries. Without knowing what specific injuries WMC or its members attribute to DNR's guidance, the group effectively asks this Court to speculate that there must be *some* injuries attributable to the guidance. (Dkt. 1:6–7.) This inferred "causal link is simply too speculative or too attenuated" to support WMC's standing. *See All. for Hippocratic Med.*, 602 U.S. at 393; *see also id.* at 383–84, 390.

Redressability is the "flip side[ ] of the same coin" of causation—if there is no clear causal connection between the defendant's conduct and plaintiff's alleged injury, a court necessarily will be unable to redress the alleged injury by issuing an order to the defendant. *See All. for Hippocratic Med.*, 602 U.S. at 380–81.

The lack of available redress is evident in the relief that WMC seeks. *See Murthy*, 603 U.S. at 73 (recognizing that redressability turns on "the relationship between 'the judicial relief requested' and the 'injury' suffered" (quoting *California*, 593 U.S. at 671). WMC seeks a declaration about which engines constitute "nonroad engines," another declaration that DNR is preempted "from imposing standards on emissions from any nonroad engine,"

and an injunction barring DNR "from imposing and enforcing emissions standards on [nonroad engines]." (Dkt. 1:25.)

But each of these forms of relief would alone be meaningless to actual regulated entities, which would still be required to either apply for new permits or comply with their existing permits until those permits are modified. *See* Wis. Stat. §§ 285.60–.62. Only *after* they obtain new permits or modifications to existing permits would their alleged injuries be redressed. *Cf. Lujan II*, 504 U.S. at 568–71.

This illustrates that, if there were to be any redress along the lines of what WMC really seeks, it must ultimately come through the permit application and modification process under Wisconsin law. And if a permittee believes that its permit imposes unlawful limits, "that injury may be redressed through the statutory challenge process" for that permit, *Disability Rights. Wisconsin, Inc.*, 522 F.3d at 803, not in a freestanding challenge to a memo *about* permitting. *Cf. Lujan II*, 504 U.S. at 568–71 (recognizing lack of redressability where plaintiff "chose to challenge a more generalized level of Government action" rather than government actions or decisions on specific projects).

\*\*\*\*\*

In challenging DNR's guidance document, WMC effectively urges this Court to "start the Federal Judiciary down" the same precipitous path the

Supreme Court recently refused to follow when addressing standing to challenge government actions and documents. *All. for Hippocratic Med.*, 602 U.S. at 393. "That path would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like—an approach to standing that this Court has consistently rejected as flatly inconsistent with Article III." *Id.*

With no injury to speak of caused by DNR's draft guidance, and thus no redress that this Court could provide by enjoining or declaring that guidance unlawful, WMC lacks standing and its complaint should be dismissed.

**B.     WMC's challenge to DNR's guidance does not present a ripe controversy.**

Even if this Court would conclude that WMC has standing to challenge the guidance, jurisdiction is nonetheless lacking because the group's challenge to the guidance does not present a ripe controversy.

**1.     Ripeness is a jurisdictional requirement that ensures that federal courts address only live cases or controversies.**

Ripeness is another component of the case-or-controversy requirement. *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019); *see also GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 620 (7th Cir. 1995). The ripeness doctrines mandates that federal courts "do not render advisory opinions" about theoretical disputes or policy disagreements. *Wisconsin's Env't*

*Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410–11 (7th Cir. 1984); *accord AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 386 (1999) (recognizing that "federal courts normally do not entertain pre-enforcement challenges to agency . . . policy statements").

The requirement of a ripe "case or controversy [is] no less strict in a declaratory judgment proceeding than in any other type of suit." *Wisconsin's Env't Decade, Inc.*, 747 F.2d at 410; *accord Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461 (1946). Declaratory judgment actions are "ripe" and thus within the federal courts' jurisdiction when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *accord Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979); *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972); *Nuclear Eng'g Co. v. Scott*, 660 F.2d 241, 252 (7th Cir. 1981).

But in a declaratory judgment action, "the positions of the parties are reversed: the declaratory-judgment plaintiff would have been the defendant in the anticipated suit whose character determines the district court's jurisdiction." *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009).

35

This means that to present a ripe claim for declaratory judgment, the declaratory judgment plaintiff "must demonstrate that the *defendants* could file a federal claim" against him or her. *Id.* (emphasis added). To establish a ripe controversy, the declaratory-judgment plaintiff must show that there is a "real and immediate" threat of suit by the declaratory-judgment defendant. *GNB Battery Techs., Inc.*, 65 F.3d at 620.

Where a declaratory judgment plaintiff challenges the action of an administrative agency, the ripeness inquiry often overlaps with the question of whether the agency's action is "final" under principles of administrative law. *See Cont'l Bank & Tr. Co. v. Martin*, 303 F.2d 214, 215 (D.C. Cir. 1962). "[F]ederal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements." *AT&T Corp.*, 525 U.S. at 386; *accord Toilet Goods Ass'n., Inc. v. Gardner*, 387 U.S. 158 (1967); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*Lujan I*). Likewise, federal courts lack jurisdiction over claims where "the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights." *Abbs v. Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992).

Thus, if an administrative agency's action or policy statement is not "final" and has "no immediate effect on the plaintiff's primary conduct," a complaint challenging the agency's action is unripe and must be dismissed

for lack of jurisdiction. *AT&T Corp.*, 525 U.S. at 386; *accord Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (recognizing "paradigmatic unripe case" as one challenging "preliminary agency policy that has not been—and may never be—enforced against the named plaintiff"). Such a claim "is not helped on the question of jurisdiction by the Declaratory Judgment Act." *Cont'l Bank & Tr. Co.*, 303 F.2d at 215.

Indeed, in some cases, even a formally "final" agency action or document will not present a ripe controversy where the agency action "does not grant, withhold, or modify any formal legal license, power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003) (quoting *Ohio Forestry Ass'n., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (citation omitted)). This commonly occurs when the object of a plaintiff's challenge is a "general statement of policy designed to inform the public of [an agency's] view on the proper application of the [law]." *Id.* (citation omitted).) Thus, where "further factual development would significantly advance [the court and the parties'] ability to deal with the legal issues," courts will dismiss as unripe an action challenging even final agency action. *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 619 (7th Cir. 2003).

In addition to considerations of finality of agency actions, courts also assess "the degree and nature of the regulation's present effect on those seeking relief." *Toilet Goods Ass'n, Inc*, 387 U.S. at 164 (1967). If the plaintiff is unable to show any threat that the challenged action will be enforced against him or her, the case should be dismissed as unripe. *Wisconsin's Env't Decade, Inc.*, 747 F.2d at 411; *see also Babbitt*, 442 U.S. at 298–99; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Poe v. Ullman*, 367 U.S. 497, 502, 508 (1961). Assertions of "uncertain or speculative business injury" or impacts on a business's operations also are not sufficient to demonstrate a ripe controversy. *Nuclear Eng'g Co. v. Scott*, 660 F.2d 241, 252–53 (7th Cir. 1981), *overruled on other grounds by Groves v. United States*, 941 F.3d 315 (7th Cir. 2019); *see also Wisconsin's Env't Decade, Inc.*, 747 F.2d at 411–12; *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952).

Another important factor is the nature of the relief the plaintiff seeks. *See Wisconsin's Env't Decade, Inc.*, 747 F.2d at 411–12. When a plaintiff seeks to invalidate a state statute or administrative rule on constitutional grounds, "[t]he requirement of 'concreteness' . . . is most stringent." *Id.* at 411. For this reason, federal courts will find an action unripe when "the constitutional question will not arise absent further authoritative decision by courts of the state" and "the possibility exists that state courts might construe state law in a manner that would avoid the asserted federal constitutional difficulty."

*Id.*; *see also State of Ill. ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 942 (7th Cir. 1983); *People of State of Ill. v. Gen. Elec. Co.*, 683 F.2d 206, 210 (7th Cir. 1982).

### 2. The draft guidance does not present a ripe controversy.

WMC challenges an administrative guidance document that was never finalized and does not impose binding obligations on anyone. (*See* Dkt. 1-3, 1-4:1.) Nor does WMC allege that the guidance has ever been "enforced" against anyone, and certainly not against WMC (*see* Dkt. 1). WMC's challenge to the draft guidance is unripe and must be dismissed.

By definition, agency guidance documents like the draft guidance here are nonbinding and, by definition, "inert," and thus cannot cause any injury. *See SEIU*, 393 Wis. 2d 38, ¶¶ 102–08, 130–34. Indeed, it is not "even conceptually possible for [guidance documents] to be 'applied' or 'enforced' against a person." *Id.* ¶ 134. Federal courts reach the same conclusion about such documents, recognizing, for example, that a "procedural framework" document does not "impose new legal requirements on regulated parties, or alter in any way the legal regime to which [challengers] are subject." *Home Builders Ass'n of Greater Chicago*, 335 F.3d at 619.

Given the statutory and court-recognized "inert[ness]" of guidance documents like the draft guidance at issue here, *see SEIU*, 393 Wis. 2d 38,

¶ 102, WMC could not even conceivably face any threat from the document, and certainly hasn't pointed to any now. This is why Wisconsin courts regularly reject such unripe challenges to agency documents or decisions. *See Sierra Club v. Wisconsin DNR*, 2007 WI App 181, ¶¶ 24–29, 304 Wis. 2d 614, 631, 736 N.W.2d 918 (rejecting challenge to interlocutory order in air-permitting process, recognizing that permittee could raise "all the challenges it has" in a petition challenging the final air permit); *see also Container Life Cycle Mgmt., LLC v. Wis. DNR*, 2022 WI 45, ¶¶ 38–39, 402 Wis. 2d 337, 352, 975 N.W.2d 621 (rejecting challenge to agency letter, on ground that challenge to letter was "really an untimely attempt to challenge" a separate administrative determination).

To be sure, if ever the guidance would be applied in a way as to somehow adversely affect someone's interests, such "mistakes are subject to judicial review pursuant to" Wisconsin's Administrative Procedure Act. *SEIU*, 393 Wis. 2d 38, ¶ 134. Thus, if one of WMC's members was ever displeased with its air permit, on the theory that the permit unlawfully regulated "nonroad sources" like WMC claims here, that member could challenge that permit decision under Wisconsin's Administrative Procedure Act, alleging that the agency action or decision adversely affects the member's "substantial interests." Wis. Stat. § 227.52.

But that's because the permittee would challenge an actual, binding permit, not some communication about how DNR thinks about the permitting process. Such preliminary challenges to nonbinding documents do not present a ripe controversy. *Home Builders Ass'n of Greater Chicago*, 335 F.3d at 619; *accord Rueth v. EPA*, 13 F.3d 227, 229–31 (7th Cir. 1993) (dismissing federal petition challenging agency action due to lack of final order).[7]

In effect, WMC seeks an end-run around the state administrative process and its finality requirement,[8] as well as around the normal judicial process and its requirement of a live controversy between adverse parties. *See Home Builders Ass'n of Greater Chicago*, 335 F.3d at 616, 618–19; *Rueth*, 13 F.3d at 229–31; *cf. Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (dismissing as unripe challenge to agency methodology document, where agency did not hold out document as binding and challenger pointed to no indication that

---

[7] *See also Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (concluding that agency guidance was both non-final and non-binding, and therefore dismissing petition for review of guidance); *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713–17 (D.C. Cir. 2015) (dismissing petition for judicial review of agency guidance, explaining that, whatever label would be given to agency document, "[t]he main point here is that the Notice is not a legislative rule carrying 'the force and effect of law'").

[8] Importantly, in the event of a final, reviewable decision under state law, the availability of state-court review would very likely preclude federal court review, or at the very least counsel in favor of abstention. *See Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 528 (7th Cir. 2021) (directing district court to abstain from reviewing challenge to state construction permit, recognizing that "[o]nly the state courts can review the agency's work for compliance with the procedural and substantive requirements of state law")

document had binding effect). And the mere fact that a challenger wants to *avoid* future, final agency action—in the form of a final decision on a permit, for example—does not establish a ripe claim within federal jurisdiction. *Abbs*, 963 F.2d at 927.

For now, without any showing that DNR's guidance has yet been "enforced" against *anyone*—much less WMC—the group's challenge to that document is, at best, unripe. *See AT&T Corp.*, 525 U.S. at 386 (1999) (reaffirming rule that federal courts "do not entertain pre-enforcement challenges to agency rules and policy statements"); *accord Lujan I*, 497 U.S. at 889–94; *Toilet Goods Ass'n., Inc.*, 387 U.S. at 162.

## C. WMC's challenge to DNR's draft guidance does not arise under federal law.

This Court also lacks jurisdiction because WMC's challenge does not "arise under" federal law, as necessary under Article III and § 1331.

### 1. Federal jurisdiction requires a case "arising under" federal law; the Declaratory Judgment Act does not create a federal cause of action sufficient for federal jurisdiction.

For a case to "arise under" federal law, "it is not enough for a plaintiff to merely call upon a constitutional provision, a federal statute, or a principle of federal common law in the complaint." *E. Cent. Illinois Pipe Trades Health & Welfare Fund*, 3 F.4th at 958–59; *see also Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 24, 27–28 (1983). Rather,

the most common way a case "arises under" federal law and satisfies § 1331 is "when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). This requires a plaintiff to point to a federal law that either expressly confers a cause of action (such as 42 U.S.C. § 1983) or impliedly grants a cause of action (such as *Bivens* action or an action for securities fraud under the Securities Exchange Act of 1934). *See E. Cent. Illinois Pipe Trades Health & Welfare Fund*, 3 F.4th at 958–59.

"[T]he Declaratory Judgment Act is not an independent source of federal subject matter jurisdiction." *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995); *accord California v. Texas*, 593 U.S. 659, 672 (2021) (recognizing that Declaratory Judgment Act "does not provide a court with jurisdiction"). The Act "empowers federal courts to give declaratory judgments in 'a case of actual controversy within its jurisdiction,' but it is not an independent grant of jurisdiction, rather jurisdiction must be predicated on some other statute." *Rueth v. EPA*, 13 F.3d 227, 231 (7th Cir. 1993). This means that, to support a claim under the Declaratory Judgement Act, a plaintiff must allege that the defendant violated, or is immediately threatening to violate, some federal right. *See GNB Battery Techs., Inc.*, 65 F.3d at 619–20.

In declaratory judgment cases, "jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant." *Id.* at 619; *see also Nuclear Eng'g Co.*

*v. Scott*, 660 F.2d 241, 252–53 (7th Cir.1981). Therefore, "an action for a declaratory judgment will invoke federal question jurisdiction *only if* the coercive action that would have been brought (were declaratory judgments not available) would have been within that jurisdiction." 13D Wright & Miller, *Fed. Prac. & Proc. Juris.*, § 3566 (3d ed.); *see also Franchise Tax Bd. of State of Cal.*, 463 U.S. at 16 (recognizing rule that federal "jurisdiction is lacking" if, "but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action"); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672 (1950). Thus, to support federal jurisdiction a declaratory judgment plaintiff must credibly allege "the possibility of an action" under federal law that is threatened by the declaratory-judgment defendant. *See GNB Battery Techs., Inc.*, 65 F.3d at 619; *Nuclear Eng'g Co.*, 660 F.2d at 252–53.

> ### 2. WMC's request for a declaration and injunction about DNR's draft guidance does not arise under federal law.

In support of this Court's jurisdiction, WMC relies primarily on the Declaratory Judgment Act, 28 U.S.C. § 2201(a), while also citing two other possible sources of federal jurisdiction: the Clean Air Act, 42 U.S.C. § 7543(e)(2)(B); and the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2. (*See* Dkt. 1:6.) WMC's challenge to DNR's draft guidance does not arise under any of these laws.

Because the Declaratory Judgment Act "does not provide a court with jurisdiction," *California*, 593 U.S. at 672, WMC must point to some federal right that DNR's draft guidance is allegedly violating. *Cf. Rueth*, 13 F.3d at 231; *GNB Battery Techs., Inc.*, 65 F.3d at 619–20. WMC has not pointed to any such federal right, and will be unable to do so.

It is not enough that WMC believes DNR's draft guidance to be preempted by federal law. (Dkt. 1:6–8.) Here, "but for the availability of the declaratory judgment procedure, [WMC's preemption] claim would arise only as a defense to a state created action." *Franchise Tax Bd*, 463 U.S. at 16. That preemption claim would arise in the context of a specific permitting action—either the decision to issue or deny a permit or a subsequent enforcement action. *See* Wis. Stat. §§ 285.81, .83. In that situation, a permittee would raise federal preemption as a defense to that state-created permit action, arguing that the permit condition or an enforcement action is unlawful because it is preempted by federal law, just as WMC describes in this case. (*See* Dkt. 1:21–25.) This is precisely the type of defensive theory that is rejected as a basis for federal jurisdiction over declaratory judgment actions. *See Franchise Tax Bd*, 463 U.S. at 16; *accord Chicago Trib. Co. v. Bd. of Trs. of Univ. of Illinois*, 680 F.3d 1001, 1003, 1005 (7th Cir. 2012) (recognizing "the holdings of *Skelly Oil* and many later decisions" that "a potential federal defense is not enough to create federal jurisdiction under § 1331").

WMC's claim thus does not arise under the Declaratory Judgment Act.

Nor does it arise under the Supremacy Clause or the concept of federal preemption. (*Contra* Dkt. 1:6.) In support of this proposition, WMC cites *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642 (2002), and *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96, n. 14 (1983), asserting that "[q]uestions of federal preemption present federal questions under 28 U.S.C. § 1331." (Dkt. 1:6.) WMC's citations to *Shaw* and *Verizon* seem to suggest that because its suit seeks a declaration about the allegedly preemptive force of federal law, the suit is within the federal courts' jurisdiction. (*See* Dkt. 1:6.)

*Verizon* and *Shaw* do not establish that WMC's attack on DNR's draft guidance arises under federal law. Those cases stand for the proposition that when a challenger to a state law claims that the law "is pre-empted by a federal statute," that claim unquestionably "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw,* 463 U.S. at 96 n.14; *see also Verizon Maryland, Inc.*, 535 U.S. at 642 (recognizing that federal courts have jurisdiction to address whether state agency's enforcement order was preempted by federal law); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 259 n.6 (1985).

But those cases don't stand for the proposition that a federal question exists anytime a litigant merely "utter[s] the word preemption." *People of State*

*of Illinois v. Kerr-McGee Chem. Corp.*, 677 F.2d 571, 577 (7th Cir. 1982). In *Shaw* and *Verizon*, the parties did not dispute that the object of the plaintiff's challenge was a "state law" and did not dispute the law's meaning; rather, the dispute was whether that "undisputed" law was preempted by federal law. *See Fleet Bank, Nat. Ass'n v. Burke*, 160 F.3d 883, 892 (2d Cir. 1998). *Verizon*, *Shaw* and progeny are thus limited to situations involving challenges to *actual state laws* that could be enforced against the declaratory-judgment plaintiff, not an assertion that some document should be treated as law and then be deemed preempted by federal law. Interpreting *Shaw* and *Verizon* more broadly, as WMC asserts, would create a novel opportunity for plaintiffs like WMC "to use a preemption claim as a way to force a state to adjudicate in federal court the meaning of a state regulatory statute," or here, something far less than a state statute. *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 892 (2d Cir. 1998); *see also* 13D Wright & Miller, *Fed. Prac. & Proc. Juris.*, § 3566 Determination From the Well-Pleaded Complaint, n.92 (3d ed.) (recognizing reasoning of *Fleet Bank*). This type of "uncertainty of state law in a preemption case" was precisely why the court in *Fleet Bank* held that federal court jurisdiction was lacking. 160 F.3d at 891.

Here, as explained, DNR's non-binding, draft guidance is not "state law,"[9] *see SEIU*, 393 Wis. 2d 38, ¶¶ 102–08; Wis. Stat. § 227.01(3m)(a)1.–2., so *Shaw* and *Verizon* provide no support for WMC's attempt to challenge the document. Without any state law to speak of, it is simply a non sequitur to consider whether the document is "preempted." *See Shaw,* 463 U.S. 85, 96 n.14; *see also Verizon Maryland, Inc.*, 535 U.S. at 642; *Fleet Bank*, 160 F.3d at 892. WMC's claim therefore does not "arise under" the Supremacy Clause.

Next, contrary to WMC's assertion, its challenge to the draft guidance does not "arise under" the Clean Air Act. (*Contra* Dkt. 1:6 (citing 42 U.S.C. § 7543(e)(2)(B)).) The provision that WMC cites, 42 U.S.C. § 7543(e)(2)(B), establishes the circumstances in which states other than California may adopt and enforce state-specific emission-control standards for nonroad engines or vehicles. That provision does not provide any right or "create [a] cause of action" for any regulated entity, *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 27–28 (1983), much less for an advocacy organization like WMC. WMC's claim therefore does not "arise under" the CAA.

---

[9] While WMC seems to suggest that it believes that the draft guidance is state law (*see* Dkt. 1 ¶¶ 99–108), their view of state law is a "a legal conclusion" that courts are free to "reject at the motion to dismiss stage." *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

Finally, insofar as WMC's claim arises under state law, it's barred by sovereign immunity. That is, if WMC's claim is that an injunction or declaration is required because DNR violated *state law*, "such a claim may not be heard in federal court." *Sorrentino v. Godinez*, 777 F.3d 410, 415 (7th Cir. 2015); *accord Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Because WMC's claim challenging DNR's draft guidance does not "arise under" any federal law, this Court lacks jurisdiction and must dismiss the complaint for this additional reason.

## II.    The complaint fails to state a claim because DNR's draft guidance does not purport to regulate mobile sources and thus is not preempted by the Clean Air Act's mobile-source preemption provisions.

If this Court agrees with any of the three jurisdictional bases to dismiss, it need not (indeed, should not) reach the substance of the draft guidance.

But if this Court concludes that it has jurisdiction, WMC's preemption theory fails to state a viable claim for relief. DNR's guidance pertains to emissions from stationary sources, and nothing in that document even purports to regulate mobile sources, so the CAA's preemption provisions are not implicated.

A. **The CAA generally preempts states from regulating emissions from mobile sources, including emissions from "nonroad engines" and "nonroad vehicles."**

In 1990, Congress amended the Clean Air Act to include a new category of "nonroad sources," "such as lawnmowers, bulldozers, locomotives, and marine vessels." *Pac. Merch. Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1110 (9th Cir. 2008); *accord Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078 (D.C. Cir. 1996) (*EMA*). The amendments governing emissions from nonroad sources comport with "the basic structure of the Clean Air Act, which 'makes the States and the Federal Government partners in the struggle against air pollution,' but sought to avoid 'an anarchic patchwork of federal and state regulatory programs.'" *Pac. Merch. Shipping Ass'n*, 517 F.3d at 1110 (quoting *EMA*, 88 F.3d at 1078, 1079).

As part of the amendments, Congress created federal authority to promulgate "regulations containing standards applicable to emissions from . . . new nonroad engines and new nonroad vehicles." 42 U.S.C. § 7547(a)(3).1. At the same time, Congress expressly prohibited states from "adopt[ing] or attempt[ing] to enforce any standard or other requirement relating to the control of emissions from . . . nonroad engines or nonroad vehicles." 42 U.S.C. § 7543(e)(1).

When assessing claims of preemption, courts begin with the presumption "that the state law has not been preempted." *Patriotic Veterans, Inc.*

*v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013); *accord Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This is because "given the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise." *Patriotic Veterans, Inc.*, 736 F.3d at 1046. When "the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (quoting *Altria Group v. Good*, 555 U.S. 70, 77 (2008)).

### B. The Clean Air Act does not preempt DNR's draft guidance because the guidance exclusively addresses emissions from stationary sources.

For WMC to establish that DNR's draft guidance is preempted, the group must show that the sources covered by the draft guidance are "mobile sources" and thus beyond the traditional authority of state regulation.[10] But on its face and as applied, the guidance addresses emissions from stationary, not mobile, sources and thus is not preempted.

---

[10] To be clear, in light of the fact that the draft guidance was never finalized, and neither intended to nor actually applied to *any* source of emissions, Secretary-Designee Hyun maintains that it is simply a non sequitur to analyze what types of sources the document "regulates." Nonetheless, Hyun proffers this argument to demonstrate that, even if the document regulated *something*, it pertains to stationary sources, not mobile sources as WMC asserts.

### 1. The text of the draft guidance pertains to emissions from stationary sources, not mobile nonroad sources.

A comparison of the substance of the draft guidance and the CAA's mobile-nonroad preemption clause makes clear that the guidance sits comfortably alongside the CAA and is not preempted.

The CAA's mobile-nonroad preemption clause says that no State may "adopt or attempt to enforce any standard or other requirement relating to the control of emissions from . . . nonroad engines or nonroad vehicles." 42 U.S.C. § 7543(e)(1). Thus, the controlling question is whether the draft guidance imposes a "standard or other requirement relating to the control of *emissions from . . . nonroad engines or nonroad vehicles*." 42 U.S.C. § 7543(e)(1). If DNR's guidance instead relates to emissions from stationary sources, not emissions from nonroad engines or vehicles, that ends the preemption analysis and the document is not preempted.

The relevant analysis is stated in the draft guidance's "Conclusions" section. (Dkt. 1-3:6.) There, DNR recognized that, in light of the preemption clauses for mobile-nonroad sources, "[s]tationary source permits cannot set emission standards for nonroad or mobile engines, vehicles, or equipment, and operation of this equipment, as their intended end use, are regulated separately from stationary sources." (Dkt. 1-3:6.) While recognizing this limitation, DNR also concluded that certain emission from *within* stationary

sources "should be included in air pollution control permits" for those stationary sources. (Dkt. 1-3:6.)

One category of emissions that would be included within the stationary source permitting framework is emissions "from engine test cells/stands for performance testing of uninstalled engines, no matter the type of equipment the engine will eventually be installed in." (Dkt. 1-3:6.) For example, if a facility produces jet engines and operates "test stands" at which the engines are "physically secured in the test cell, which is a permanent structure," emissions from those test stands would be covered by the stationary source permit. (*See* Dkt. 1-3:2–3.) In explaining this approach, DNR pointed both to other states' approaches and to the federal regulations for emissions of hazardous air pollutants from stationary sources (NESHAP), which expressly regulate emissions from such "test cells/stands," and explained that engines at these test cells "are in an immobile state and therefore are not emitting an air contaminant while moving." (*See* Dkt. 1-3:2–3, 6); *see also* 40 C.F.R. §§ 63.9285–.9300.

Another category of emissions that would be included within stationary-source permitting is "[e]missions from operation of partially assembled motor vehicles and other nonroad equipment prior to being introduced into commerce, because the partially assembled equipment is similarly immobile and not capable of emitting while moving." (Dkt. 1-3:6.) Relying on similar

rationale applicable to test stands/cells, DNR explained that, for example, where a facility manufactures lawnmowers and tests lawnmower motors within that facility, those engine-test emissions would be included in the facility's stationary-source permit limits. (*See* Dkt. 1-3:2–3, 6.)

The third category of emissions addressed in DNR's guidance is "[e]missions from fully or partially assembled motor vehicles and other nonroad equipment that will not be introduced into commerce." (Dkt. 1-3:6.) For this category, DNR again analogized to the types of emission sources addressed in federal NESHAP regulations for stationary sources, and explained that because equipment in this category would never become a final product, those pieces of unfinished equipment "cannot be concluded to be nonroad equipment," as would be covered by federal regulations for nonroad sources. (Dkt. 1-3:6.)

The guidance also recognized certain emissions that DNR *would not* consider stationary-source emissions. These included emissions from the "operation of fully assembled cars, trucks, ATVs, tractors, forklifts, lawn mowers, leaf and snow blowers, and portable generators at or within a facility." (Dkt. 1-3:7.) Similarly, DNR made clear that for facilities that manufactures nonroad vehicles or equipment, emissions from "fully assembled and functional" units "being driven to a loading dock or warehouse" generally would not need to be included in the facility's stationary-source permit limits.

(Dkt. 1-3:7.) Also excluded would be emissions from "fully assembled and functional units" that, before being shipped, are "turned on to test readiness of the complete product for sale." (Dkt. 1-3:7.)

In addition to these specific exclusions from stationary-source permitting, DNR also has since confirmed that where a permittee presents a source-specific showing that certain emissions should be treated as mobile-nonroad, DNR "will consider . . . removal [of those emissions] from a source's stationary source permit." (Dkt. 1-4:3.)

Thus, because the guidance does not impose any "standard or other requirement relating to the control of *emissions from . . . nonroad engines or nonroad vehicles*," 42 U.S.C. § 7543(e)(1), the guidance comports with the mobile-nonroad preemption provision and therefore is not preempted.

> **2.    Case law confirms that DNR's guidance pertains to stationary, not mobile, sources and that the guidance is not preempted.**

In addition to the text of DNR's guidance and the CAA's mobile-nonroad preemption provision, case law confirms that DNR's guidance here is not preempted. The Ninth Circuit's analysis in *Jensen Family Farms v. Monterey Bay Unified Air Pollution Control District*, 644 F.3d 934, 937 (9th Cir. 2011), is highly instructive.

*Jensen* involved a challenge to a California administrative rule that set emission standards for certain diesel engines, and the question before the court

was whether those engines, as defined, were stationary or mobile-nonroad sources. *See id.* at 941. The relevant rule provided that covered diesel engines are those designed to stay in one location, including those "attached to a foundation" or which "reside[ ] at the same location for more than 12 consecutive months" (or less if used on a seasonal basis for the "full annual operating period" of the agricultural operation). *Id.* at 941–42. The challengers claimed that regulating emissions from those sources was preempted on much the same theory that WMC raises here. *See id.* at 937, 941–42.

The Ninth Circuit agreed with the district court and held that the rule defining and regulating this category of stationary sources could lawfully be applied to the diesel engines at issue, and was not preempted by the CAA. *See id.* The court held that the way the rule defined the types of engines to which it applied, it "applies only to stationary engines, which . . . are mutually exclusive from nonroad engines." *Id.* at 942.

Most relevant here, the court highlighted the California rule's similarity to the federal administrative rule defining "nonroad engine," which excludes any engine that "remains or will remain at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source." *Id.* at 942 (quoting 40 C.F.R. § 89.2).[11] Most critically—both

---

[11] The federal regulation cited in *Jensen Family Farms* is no longer operative, but the same definition for nonroad sources now appears in 40 C.F.R. § 1068.30(2)(iii).

in *Jensen* and here—that exclusion provides that "[a]ny engine (or engines) that replaces an engine at a location and that is intended to perform the same or similar function as the engine replaced will be included in calculating the consecutive time period." *Id.* at 942 (quoting 40 C.F.R. § 89.2). In other words, if an engine will be operated at a location for more than 12 consecutive months—or if another engine will replace the first engine to serve the same function in that location—emissions from whatever engine is at that location will be considered stationary-source emissions, not nonroad engine emissions. *See id.*

*Jensen*'s reasoning applies directly to DNR's guidance. To illustrate by reference to DNR's example of uninstalled lawnmower engines or partially assembled lawnmowers (*see* Dkt. 1-3:6), the guidance would treat those engines the same way that California's rule treated the immobile diesel engines at issues there and the same way the federal rule treats similar engines used in the identified ways. *See Jensen*, 644 F.3d at 942. Thus, in each instance, emissions from these stationary engines—such as uninstalled lawnmower engines at a fixed "test stand" in DNR's guidance or the compression ignition engines "attached to a foundation or resid[ing] at the same location for more than 12 consecutive months" in *Jensen*—are properly treated as part of the stationary source's emissions, notwithstanding that there

might be multiple, theoretically movable engines that are successively placed within that test stand. (*See* Dkt. 1-3:2–3, 6); *Jensen*, 644 F.3d at 942.

Also instructive is the U.S. Supreme Court's decision in *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246 (2004). Although the Court held that a California agency's rules regarding fleet emissions standards *were* preempted, the Court's reasoning confirms that DNR's guidance here is not.

*South Coast* involved challenges to state administrative rules that required some public and private fleet operators to purchase low-emissions vehicles. *See* 541 U.S. at 248–51. The question was whether those rules about purchasing vehicles was a "*standard* relating to the control of emissions from new motor vehicles." *Id.* at 252 (quoting 42 U.S.C. § 7543(a)).

In holding that the purchasing requirement was such a "standard" and that the rules were preempted, the Court provided examples of the types of restrictions that constituted such "standards." *See id.* at 253. These include regulations requiring that a vehicle or engine (1) "not emit more than a certain amount of a given pollutant," (2) "be equipped with a certain type of pollution-control device," or (3) "have some other design feature related to the control of emissions." *Id.*; *accord Jensen*, 644 F.3d at 939–40 (discussing *South Coast*'s "examples of requirements . . . that would properly be considered 'standards relating to the control of emissions'").

Applying *South Coast*'s interpretation of "standards" to DNR's guidance, nothing in the guidance constitutes a "standard or other requirement relating to the control of emissions *from . . . nonroad engines or nonroad vehicles*." 42 U.S.C. § 7543(e)(1). The guidance does not, for example, provide that any nonroad engine may not "emit more than a certain amount of a given pollutant." *South Coast*, 541 U.S. at 253. Nor does the guidance require that any nonroad engines "be equipped with a certain type of pollution-control device," or "have [any] other design feature related to the control of emissions." *Id.* Rather, the guidance instructs that any such limits will be imposed and enforced as to the stationary source *as a whole*, not as standards that would be applicable to emissions from individual engines or vehicles *within* any stationary source. (*See* Dkt. 1-3:6–7.)

The rationales in *Jensen* and *South Coast*, along with the text of the federal regulations defining nonroad sources, confirm that federal law authorizes regulating emissions from certain movable engines within the stationary-source permitting regime, and that DNR's guidance is not preempted.

### 3. The presumption against preemption supports reading DNR's guidance as applying to stationary sources.

Finally, if there were any remaining doubt that DNR's draft guidance is not preempted, the traditional presumption against preemption should remove

that doubt. *See Patriotic Veterans, Inc.*, 736 F.3d at 1046; *see also Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009). Here, not only has DNR endeavored to limit its guidance to sources that it concludes are "stationary sources" (Dkt. 1-3:6–7), and not only has the agency explicitly opened the door to "case-by-case" requests for permit modifications where appropriate (Dkt. 1-4:3), but the agency also faces *separate* federal obligations related to ensuring that the State of Wisconsin does not violate the National Ambient Air Quality Standards [NAAQS], which require the state to take various measures to protect air quality in areas across the state. (*See* Dkt. 1-4:2). As DNR explained in its response to comments about the draft guidance, changing the state's interpretation of the term "stationary source" (as used in the draft guidance) could result in violations of the [NAAQS], including through certain areas in the state "backsliding . . . into nonattainment [of the NAAQS], or, for other areas, interfering with "progress toward . . . attainment . . . or meeting any other applicable requirement governing air pollution prevention." (Dkt. 1-4:2.)

In short, not only is DNR's guidance about stationary-source emissions correct, but its treatment of emissions from stationary sources is arguably *compelled* to fulfill Wisconsin's other obligations under the CAA. (Dkt. 1-4:2) Viewed in this light, if there were any doubt that DNR's guidance is not preempted, that doubt should be resolved against preemption and in favor of

DNR's approach in the guidance. *See Patriotic Veterans, Inc.*, 736 F.3d at 1046; *Wyeth*, 555 U.S. at 565 & n.3.

### C. The permits on which WMC relies illustrate that DNR is not unlawfully regulating mobile sources.

The preceding discussion demonstrates that, as a matter of law, DNR's guidance is lawful and not preempted. That can end the inquiry.

But if more were needed, WMC's attachments confirm that DNR's actions in specific cases are lawful. WMC attached three permits to its complaint to illustrate what it believed to be unlawful, preempted regulation of nonroad mobile sources. (Dkt. 1-8–1-10.) Even putting aside that no party has actually challenged any specific permit, each of the permits illustrates that Wisconsin's approach properly regulates stationary, not mobile, sources.

The first permit that WMC points to is for Mercury Marine, "a facility for the manufacture of marine engines." (Dkt. 1-8.) Both the permit and WMC's complaint recognize that the emissions covered by the permit are those emitted from various "stacks" at the facility.[12] (*See* Dkt. 1-8:32–43; *see also* Dkt. 1 ¶ 116.) This demonstrates that the permit does not regulate emissions *from* specific engines within the facility, as WMC would have the Court believe, but rather *from* the stacks from which all internal emissions

---

[12] *See* Wis. Admin. Code NR § 400.02(147) (defining "stack" as "any device or opening designed or used to emit air contaminants to the ambient air").

would be discharged into the environment. (*See, e.g.*, Dkt. 1-8:32–33 (imposing per-hour emission limits for various stacks discharging from the facility.[13]) Because the permit regulates emissions from the stationary source, and imposes no "standards relating to control of emissions *from nonroad vehicles or engines*," 42 U.S.C. § 7543(e), this permit's terms comport with federal law and further illustrate that DNR's guidance on this topic was lawful and is not preempted.

The second permit on which WMC relies was issued to Briggs & Stratton, LLC, a Wisconsin-based engine manufacturer, for "a facility that produces small (3 to 20 hp) gasoline-powered four stroke engines." (Dkt. 1-9:1.) This permit follows the same pattern as the first, again imposing limits on emissions from "stacks" rather than any specific engines. (*See* Dkt. 1-9:41–48; *see also* Dkt. 1 ¶ 110 (WMC complaint, citing p. 41 of permit).) To illustrate, the portion of the permit that WMC cites provides that "[t]he permittee may not cause, allow or permit the emission of particulate matter to the ambient

---

[13] WMC cites multiple pages from the permit (*see* Dkt. 1 ¶ 109 (citing Dkt. 1-8:32–43)), but the pattern within each of the cited pages is the same: the permit identifies the *stacks* covered by that section of the permit (e,g., "R. S03A to S03-C, P03," Dkt. 1-8:32), then identifies the multiple pollutants that the facility expects to emit from that stack (e.g., particulate matter, visible emissions, carbon monoxide, nitrogen oxides), with specific limitations for each type of pollutant. (*See* Dkt. 1-8:32–43.) The permits thus illustrate that it pertains to stacks emitting from the stationary source, not specific internal engines within that source, as WMC implies. (*See* Dkt. 1 ¶ 116 (suggesting that permit imposes limits on "emissions from nonroad engines").)

air in excess of 0.1611 pounds per hour *from Stacks S78A, S78B, S78C and S78D* combined." (Dkt. 1-9:41 (emphasis added).) This again imposes no emissions limits on emissions *from* nonroad engines and instead pertains solely to emissions *from* the stationary source itself. Thus, even if someone had challenged this four-year-old permit, the provisions that WMC points to are lawful and not preempted.

The third permit that WMC cites was issued to Kohler Company for "a small engine manufacturing facility." (Dkt. 1-10.) That permit, like the others, includes limitations on emissions from stacks, not individual engines. (*See* Dkt. 1-10:15 (discussing parameters and height requirements for covered stacks).)

The Kohler permit also illustrates another feature, directly analogous to the situation addressed in federal regulations. As discussed above, federal regulations provide that emissions from test cells/stands are to be included in and covered by the stationary source permit. *See* 40 C.F.R. §§ 63.9280–.9300; *cf. Jensen Fam. Farms, Inc.*, 644 F.3d at 941–42 (discussing regulations covering successive engines that "replace[ ] an engine at a location and that [are] intended to perform the same or similar function as the engine replaced"). Kohler's permit covers such "test stands," and in fact, those stands appear to be the focus of WMC's argument. (*See* Dkt. 1-10:7–31 (highlighting permit limits on "test stands.)) Whatever WMC means to suggest by highlighting

those portions of Kohler's permit, it does not illustrate any unlawful regulation and instead comports perfectly with federal law.

*****

If the Court reaches the substance of DNR's draft guidance, that document is lawful and not preempted, and WMC challenge to the document fails to state a claim on which relief may be granted.

## CONCLUSION

The complaint should be dismissed for lack of jurisdiction. If the Court reaches the substance of DNR's guidance, the complaint fails to state a claim on which relief may be granted, and should be dismissed on that basis.

Dated this 15th day of May 2025.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

FRANCES REYNOLDS COLBERT
Assistant Attorney General
State Bar #1050435

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904 (GJK)
(608) 266-9226 (FRC)
(608) 294-2907 (Fax)
gabe.johnson-karp@ wisdoj.gov
frances.colbert@wisdoj.gov