IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN MANUFACTURERS
AND COMMERCE, INC.,

                    Plaintiff,

        v.                                                OPINION and ORDER

KAREN HYUN,                                               25-cv-155-amb
*Secretary-Designee of the Wisconsin Department*
*of Natural Resources, in her official capacity,*

                    Defendant.

---

Plaintiff Wisconsin Manufacturers and Commerce, Inc. (WMC) is a business trade association that represents approximately 3,800 member companies. Plaintiff alleges that the Wisconsin Department of Natural Resources (DNR), headed by defendant Karen Hyun, has been imposing standards on emissions from nonroad engines when tested by manufacturers and that these actions are unlawful because they are preempted by the Clean Air Act (CAA). The parties have consented to jurisdiction by a United States Magistrate Judge. Dkt. 14.

Defendant moves to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 11. Under Rule 12(b)(1), defendant argues the court lacks subject matter jurisdiction because plaintiff lacks standing and because the controversy is unripe and does not arise under federal law. For the following reasons, the court agrees that plaintiff lacks associational standing. Defendant's motion is therefore GRANTED and the complaint is DISMISSED. Because this conclusion is dispositive, the court does not reach defendant's remaining arguments.

FACTUAL ALLEGATIONS[1]

## A. The CAA

The CAA, 42 U.S.C. § 7401, *et seq.*, is a federal law that regulates air emissions. Under the statute, the federal government, through the Environmental Protection Agency (EPA), sets National Ambient Air Quality Standards (NAAQS). Each state must develop a state implementation plan that lays out how the state will conform with NAAQS. States may also adopt their own air quality standards.

The CAA regulates emissions from stationary sources and mobile sources. Stationary sources are fixed-location sources such as factories and powerplants, and are primarily regulated by the states they are in. States impose standards on stationary-source emissions to comply with NAAQS, and they generally enforce their own standards through a permitting program. States issue construction permits and operation permits to stationary sources within their borders that lay out plans and schedules for limiting a stationary source's emissions. In Wisconsin, these permits cost hundreds if not thousands of dollars to obtain, and manufacturers must often pay attorneys and consultants to help keep and renew their permits.

By contrast, mobile sources are an expansive category of things that move or can be moved from place to place. They include on-road vehicles, such as cars and trucks, that are

---

[1] The facts in this section are derived primarily from the complaint, Dkt. 1, and the attachments, *see* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Williamson v. Curran*, 714 F.3d 432, 435--36 (7th Cir. 2013) (documents attached to complaint and referenced therein become part of the complaint and may be considered by the court in resolving a motion to dismiss). These facts are taken as true for the purpose of resolving this motion. *See Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007) (on review of dismissal under Rule 12(b)(6), the court accepts plaintiff's well-pleaded allegations as true and draws all favorable inferences for plaintiff); *see also Choice v. Kohn Law Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023) (same under Rule 12(b)(1)).

used solely for transporting people or property on roads, and nonroad emissions sources built for use in yards, driveways, water bodies, and the like, such as lawnmowers, snowblowers, tractors, and boats. Because mobile sources can cross state lines quickly, mobile-source regulation is reserved primarily for the federal government through the EPA.

The primary reason for this division of regulatory power is to avoid conflicting state and federal regulation of the same emissions source.

## B. DNR's regulation of nonroad engines

Plaintiff alleges that DNR is imposing standards on emissions from a specific type of nonroad mobile sources called nonroad engines. A nonroad engine is an internal combustion engine that is not part of a motor vehicle. Manufacturers turn on and test nonroad engines in their facilities for reasons such as quality control and research and development.

Plaintiff cites a 2021 draft technical document issued by DNR. In it, DNR concludes that it may regulate "emissions generated from internal combustion engines or equipment during the manufacturing process" as stationary source emissions. Dkt. 1-3 at 1. DNR states that it has "included emissions from internal combustion engines that occur during the manufacturing process" in its stationary source air permits for over 30 years. *Id.* Specifically, DNR states that it may regulate emissions from the operation of partially assembled nonroad equipment before it is introduced into commerce, and emissions from fully or partially assembled nonroad equipment that will not be introduced into commerce, including engines tested for research and development, quality control, reliability, or diagnostics. *Id.* at 6–7. DNR ultimately did not finalize this draft technical support document after receiving public input. Dkt. 1-4 at 1. Even so, plaintiff alleges that DNR has put that guidance into practice.

3

Plaintiff references three stationary-source operation permits issued by DNR to nonmember engine manufacturers as examples of how DNR allegedly "regulates nonroad sources in the state." Dkt. 1, ¶ 109 n. 10. The first, issued for the construction of a marine engine remanufacturing facility, allegedly imposes emissions standards on engines tested in dynamometers, a device that measures torque, force, or power, and other test stands used for testing stationary or uninstalled mobile engines. Dkt. 1-8 at 1, 32–43. The second, issued for a facility that produces small gasoline-powered four stroke engines, allegedly imposes emissions standards on nonroad engines used for research and development. Dkt. 1-9 at 1, 41. The third, issued for a small engine manufacturing facility, allegedly imposes emissions standards on engines tested in dynamometers and other test stands. Dkt. 1-10 at 1, 6, 13–16, 19.

Plaintiff does not challenge the specific standards in these permits, Dkt. 1, ¶ 109 n. 10, but offers them as evidence of DNR's alleged improper practice of imposing emissions limits on nonroad engines.

## C.  Relief sought

Plaintiff seeks declaratory and injunctive relief on behalf of its members. Specifically, a declaration that nonroad engines as defined under the CAA are not subject to DNR regulation even when they are not installed or integrated into a vehicle and undergo testing by a manufacturer in a facility. Plaintiff also seeks an order permanently enjoining defendant from imposing and enforcing emissions standards on engines that fall within the definition of a nonroad engine unless those emissions standards are otherwise exempted from preemption. Finally, plaintiff seeks its costs and attorney fees.

LEGAL STANDARDS

Article III of the United States Constitution limits federal courts' scope of judicial review to live cases and controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). "To effectuate that limitation on our jurisdiction, we must be sure the plaintiff has a sufficient 'personal stake' in the case—in other words, standing to sue." *Satanic Temple, Inc. v. Rokita*, 163 F.4th 1061, 1066 (7th Cir. 2026).

An organization like plaintiff, as with every plaintiff who sues in federal court, must establish Article III standing to pursue its claims. First, the plaintiff must have suffered an "injury in fact"—a concrete and particularized injury that is actual or imminent. *Lujan*, 504 U.S. at 560. Second, the defendant's actions must have directly caused the injury. *Id.* Third, the harm suffered must be redressable by a favorable court decision. *Id.* at 561. And when seeking prospective relief, like a declaratory judgment or an injunction, the plaintiff also "must establish a sufficient likelihood of future injury" to secure standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024); S*imic v. City of Chicago*, 851 F.3d 734, 738–39 (7th Cir. 2017).

An organization's standing "can arise from concrete injuries to its members or because the defendant 'directly affected and interfered' with the group's 'core business activities.'" *Wisconsin Voter All. v. Millis*, 166 F.4th 627, 629 (7th Cir. 2026) (per curiam) (quoting *Hippocratic Med.*, 602 U.S. at 395). Plaintiff invokes associational standing, or the ability to sue on behalf of its members "even without a showing of injury to itself." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (citation omitted); *see* Dkt. 16 at 6 ("WMC has associational standing"). Specifically, plaintiff alleges that its members "are subject to DNR's regulatory conduct challenged" and that plaintiff "has standing

5

to bring this lawsuit and assert the claims in this complaint on behalf of its members who have been affected by DNR's regulation of emissions from nonroad engines" and who "must spend time and money" to ensure compliance that could be used to improve their products, their manufacturing process, and to raise employee wages.  Dkt. 1, ¶¶ 36–37.

To establish associational standing, plaintiff must show that "at least one of its members would 'have standing to sue in their own right,'" the lawsuit protects interests "germane to the organization's purpose," and the "participation of individual members" is not necessary.  *Prairie Rivers Network*, 2 F.4th at 1008.  "The first two elements derive from the Constitution's '[C]ase or [C]ontroversy requirement' necessary to secure our jurisdiction whereas the third is prudential, 'best seen as focusing on … matters of administrative convenience and efficiency.'"  *Satanic Temple*, 163 F.4th at 1067 (alterations in original) (citations omitted).

Plaintiff, as the party seeking to invoke federal jurisdiction, has the burden of establishing that it meets the requirements of Article III standing.  *Id.* at 1066.  The "manner and degree of evidence required" to establish standing depends on the stage of litigation.  *Id.* at 1067.  Defendant brings a facial challenge to plaintiff's assertion of standing, meaning that "plaintiff fails to satisfy the requirements of standing on the pleadings, even if the complaint's well-pleaded allegations are taken as true."  *Id.* at 1068.  The court thus looks to the complaint to see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in plaintiff's favor.  *Prairie Rivers Network*, 2 F.4th at 1007.  At the pleading stage, the court presumes that general allegations include the specific facts necessary to support the claim.  *Lujan*, 497 U.S. at 889.

6

ANALYSIS

The court must grant defendant's motion because plaintiff has not alleged sufficient facts to establish associational standing.

## A.  Threshold issues

There are two threshold issues, both of which the court resolves in plaintiff's favor. First, the court clarifies the scope of plaintiff's challenge.  Defendant seeks to characterize the challenge as a narrow one limited to DNR's draft guidance document and argues that such guidance documents "cannot injure anyone" because they are non-binding.  Dkt. 12 at 28–29. But this misconstrues the complaint and fails to apply the appropriate lens for evaluating plaintiff's allegations.  *See Prairie Rivers Network*, 2 F.4th at 1007.  Plaintiff is not challenging the guidance document itself; rather, the document is offered as support for plaintiff's challenge to DNR's allegedly decades-long practice of improperly regulating emissions from certain nonroad engines.  For purposes of resolving the motion to dismiss, the court considers the full breadth of plaintiff's allegations, which encompass not only the guidance document but the practice of regulating emissions from nonroad engines running in facilities.

Second, the court accepts at this juncture plaintiff's decision to bring its suit on behalf of an unspecified number of unnamed members.  In plaintiff's words, it is asserting claims "on behalf of its members who have been affected by DNR's regulation of emissions from nonroad engines."  Dkt. 1, ¶ 36.  Plaintiff argues this is satisfactory, citing the Seventh Circuit's statement in *Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors* that standing "allows for the member on whose behalf the suit is filed to remain unnamed by the

organization." 522 F.3d 796, 802 (7th Cir. 2008).[2] Yet even that case indicated that the organization still needed to "identify" the unnamed member or members in some fashion. *See id.* at 803–04 (the complaint does not "identify" any disabled student with standing to bring suit based on the alleged unlawful conduct); *see also Satanic Temple*, 163 F.4th at 1069 n.10 (making the same observation about *Disability Rts. Wisconsin*). And the United States Supreme Court has subsequently stated that "naming the affected members" is a requirement for associational standing that "has never been dispensed with in light of statistical probabilities, but only where *all* members of the organization are affected by the challenged activity." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (emphasis in original).

This precedent appears to cut against plaintiff's position and require at least the identification, even pseudonymously, of a specific member or members that allegedly suffered

---

[2] Plaintiff also relies on several out-of-circuit cases in support of its position that "trade associations regularly file federal lawsuits on behalf of its members" and courts "seemingly never question whether trade associations have standing to bring such lawsuits" despite an independent obligation to determine whether subject-matter jurisdiction exists. Dkt. 16 at 12 and n. 4. In other words, plaintiff must have standing here if these other courts did not question standing in these cases. Courts are aware of the obligation to ensure subject-matter jurisdiction. *See, e.g.*, *Prairie Rivers Network*, 2 F.4th at 1010 (courts have an independent obligation to assure that standing exists at each stage of a lawsuit). And courts do raise standing sua sponte in cases involving companies and organizations. *See, e.g., Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498 (5th Cir. 2004) (sua sponte raising the issue of the plaintiff companies' standing to challenge flow control ordinances); *Native Vill. of Tanana v. Cowper*, 945 F.2d 409 (9th Cir. 1991) (addressing sua sponte whether one plaintiff has associational standing); S*tavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1088 (E.D. Cal. 2020) (court must determine the existence of associational standing sua sponte); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1165 (M.D. Ala. 2016) (court raised the associational standing issue sua sponte with respect to plaintiff Alabama Disabilities Advocacy Program); *Voters Organized for the Integrity of Elections v. Baltimore City Elections Bd.*, 214 F. Supp. 3d 448, 453 (D. Md. 2016) (considering the issue of associational standing sua sponte). In any event, plaintiff cites cases that do not address standing, and the court will not read anything into that silence for purposes of determining whether associational standing exists here.

injury. *See, e.g., Satanic Temple*, 163 F.4th at 1070 (an estimate of an organization's involuntarily pregnant members, without evidence that any one of them would want an abortion, is not sufficient evidence that any of the plaintiff's members has personally suffered an actual or threatened injury as a result of a state's anti-abortion law); *Prairie Rivers Network*, 2 F.4th at 1009 (plaintiff "speaks of its individual members only as a collective," but presuming that at least one of the members has standing to sue on their own "trends too closely" to the theory of associational standing rejected in *Summers*); *see also Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (*Summers* did not impose "a requirement that an organizational plaintiff identify affected members by their legal names" as opposed to pseudonymously identifying affected members).

Still, the Seventh Circuit has "reserved for another day" the question of whether its statement in *Disability Rights Wisconsin* remains good law in light of *Summers*. *Satanic Temple*, 163 F.4th at 1069. Because the issue has yet to be resolved in this circuit, this court will not require plaintiff to identify specific members by name to satisfy standing.

## B. Associational standing

Even with both threshold issues resolved in plaintiff's favor, the court is not assured that any of plaintiff's members has standing to sue. Plaintiff alleges that it "has standing to bring this lawsuit and assert the claims in this complaint on behalf of its members who have been affected by DNR's regulation of emissions from nonroad engines." Dkt. 1, ¶ 1. It goes on to state the following:

- WMC has members who manufacture nonroad engines and are subject to DNR's regulatory conduct challenged in this complaint.

- When testing nonroad engines, these members spend time and money ensuring they do not exceed DNR's emissions limits.

- If those limits persist, those members will continue spending time and money ensuring compliance with these preempted emissions standards.

*Id.*, ¶ 37.

These allegations fall short of establishing standing. Allegations of "generalized harm to a group of individual members" do not support associational standing. *Prairie Rivers Network,* 2 F.4th at 1010. Even at this early stage, plaintiff must "provide some way of showing that *at least one* individual member has standing to sue on their own." *Id.* (emphasis in original). The allegations listed above do not do that. Essentially, they assert that some subgroup of plaintiff's members manufacture nonroad engines and, "[i]f [DNR's emission] limits persist," Dkt. 1, ¶ 37, those members will spend time and resources to comply with those limits. They do not allege any limit or standard imposed against any particular member. Consequently, they do not allege any concrete expenditure of time or money made by a particular member. "Just as 'generalized harm to the forest or the environment will not alone support standing,' generalized harm to a group of individual members will not do so for associational standing." *Prairie Rivers Network,* 2 F.4th at 1010 (quoting *Summers*, 555 U.S. at 494).

Plaintiff does provide some additional detail by pointing to three permits it alleges are illustrative of DNR's alleged unlawful practice of regulating nonroad engines. But these permits are not alleged to have been issued to any of its members, and plaintiff disclaims challenging the standards in these permits. *See* Dkt. 1, ¶¶ 109, 109 n. 10, & 110 (permits issued to nonroad-engine manufacturers "show through example how DNR regulates nonroad sources in the state"). Presumably, these permits are tailored to the permittees, who would

have standing to challenge them as unlawful, but the permittees are not named in this lawsuit or otherwise alleged to be a part of it. *See, e.g.*, Wis. Stat. § 227.52 (Wisconsin Administrative Procedure Act's provision for judicial review of agency actions that affect a party's "substantial interests").

Plaintiff encourages the court to infer that its members have spent time and money to comply with DNR's allegedly unlawful permitting practices, but given the generalized nature of the allegations, this would require impermissible speculation. *See Prairie Rivers Network*, 2 F.4th at 1010. Although monetary harm is generally a tangible injury that "readily qualif[ies]" as a concrete injury, the injury must be particularized and actual or imminent. *Wisconsin Voter All.*, 166 F.4th at 632. Here, the court would have to pile conjecture on top of conjecture to infer such an injury. It would need to assume that DNR had issued a permit to one of plaintiff's members, that the permit limited emissions from a nonroad engine used in that member's facility, that the member diverted time and money to comply with the permit's limits, and that the diversion caused the member harm. While these things are possible, they "'stop[] short of the line between possibility and plausibility.'" *See Prairie Rivers Network*, 2 F.4th at 1010 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Finally, to the extent plaintiff relies on its or its members' collective efforts to marshal their resources to prophylactically challenge DNR's alleged practice of regulating nonroad engine emissions, the United States Supreme Court has rejected this theory of standing. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (an organization that has not suffered a concrete injury cannot "manufacture its own standing" by spending "money to gather information and advocate against the defendant's action."); *see also Wisconsin Voter All.*, 166 F.4th at 643 (Brennan, J., concurring) ("The bare recitals of public education expenses

offered in the [plaintiff's] amended complaint run afoul of *Hippocratic Medicine*'s prohibition on 'manufactre[d] standing.'").

At bottom, the court is left with the impression of a generalized grievance against DNR's alleged ongoing regulation of nonroad engine emissions, which is insufficient to establish associational standing.

ORDER

IT IS ORDERED that Defendant Karen Hyun's motion to dismiss, Dkt. 11, is GRANTED and the complaint is DISMISSED for lack of subject-matter jurisdiction.

Entered March 27, 2026.

BY THE COURT:

/s/

_____

ANITA MARIE BOOR
Magistrate Judge